**Dorothy LOUGHMAN**

v.

**CONSOL–PENNSYLVANIA COAL COMPANY, a corp.; Rhein Braun U.S., a corp.; Monongahela Railway Company, a corp.; James Leach, an individual; David Boggs, an indiv.; Ewing Pollock, an indiv.; and the law firm of Pollock,**

Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Company; Consol–Land Development Company; Rheinbraun Verkaufsgesellschaft, MBLT; and Maria Therese Verkaufsgesellschaft; Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk;

Ewing Pollock and The Law Firm of Pollock, Pollock and Thomas, Appellants in No. 92–3380.

Paul KENT; Mabel Kent, Appellants in No. 92–3437,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corp.; Rhein Braun U.S., a corp.; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Maria Theresia Bergbaugesellschaft MBH; Rheinische Braunkohlenwerk;

James McINTYRE; Glenna McIntyre, Appellants in No. 92–3438,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corp.; Rhein Braun U.S., a corp.; Monongahela Railway Company, a corp.; Mike Wilson, an ind.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk;

Mark E. HEADLEE; Charlotte Headlee, Appellants in No. 92–3439,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Maria Theresia Bergbaugesellschaft MBH; Rheinische Braunkohlenwerk.

Dorothy LOUGHMAN,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Rheinbraun Verkaufsgesellschaft, MBLT; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk;

Consol Pennsylvania Coal Co.; Consol–Land Development Co., Consolidation Coal Co., The Monongahela Railway Co., Maria Theresia Bergbaugesellschaft, Rheinbraun U.S. and Rheinische Braunkohlenwerk, Appellants in No. 92–3444.

Dorothy LOUGHMAN, Appellant in No. 92–3445,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Rheinbraun Verkaufsgesellschaft, MBLT; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk.

**90**

Larry LEVINE; Dan Levine; Morris Levine; Edward Levine, individuals; and Morris Levine Enterprises, Inc., a corporation; and Levine Iron and Metal, Inc., a corporation,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Rheinbraun Verkaufsgesellschaft, MBLT; Maria Therese Verkaufsgesellschaft, MBLT; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk;

Larry Levine, Dan Levine, Morris Levine, Morris Levine Enterprises, Inc., and Levine Iron and Metal, Inc., Appellants in No. 92–3446.

James E. HUGHES; Linda L. Hughes, Appellants in No. 92–3447,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; William Reese, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk.

John W. YESENOSKY, Jr.; Linda M. Yesenosky, Appellants in No. 92–3450,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; William Reese, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Rheinbraun Verkaufsgesellschaft, MBLT; Maria Therese Verkaufsgesellschaft, MBLT; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk.

Thomas J. ALLEN, Esquire, Personal Representative of the Estate of John T. Throckmorten, Appellant in No. 92–3451,

v.

CONSOL–PENNSYLVANIA COAL COMPANY, a corporation; Rhein Braun U.S., a corporation; Monongahela Railway Company, a corp.; James Leach, an ind.; David Boggs, an ind.; Ewing Pollock, an ind.; and the law firm of Pollock, Pollock and Thomas; The Upshur Agency, Inc.; Consolidated Coal Co.; Consol–Land Development Co.; Rheinbraun Verkaufsgesellschaft, MBLT; Maria Therese Verkaufsgesellschaft, MBLT; and Maria Theresia Bergbaugesellschaft, MBH; Rheinische Braunkohlenwerk.

Nos. 92–3380, 92–3437 to 92–3439, 92–3444 to 92–3447, 92–3450 and 92–3451.

United States Court of Appeals, Third Circuit.

Argued May 12, 1993.

Decided Sept. 13, 1993.

Louis M. Tarasi, Jr. (argued), Joseph J. Hinchliffe, Tarasi & Johnson, P.C., Pittsburgh, PA, David C. Hook, Hook & Hook, Waynesburg, PA, for Dorothy Loughman, Mabel Kent, James McIntyre, Glenna McIntyre, Mark Headlee, Charlotte Headlee, Larry Levine, Dan Levine, Morris Levine, Morris Levine Enterprises, Inc., Levine Iron and Metal, Inc., James Hughes, Linda Hughes, John W. Yesenosky, Jr., Linda M. Yesenosky, Thomas J. Allen.

Joseph A. Katarincic (argued), Terrence J. O'Rourke, Kenwyn Anne Fuller, Katarincic & Salmon, Pittsburgh, PA, for Consol–Pennsylvania Coal Co., Consolidation Coal Co., Consol Land Development Co., The Monongahela Railway Co., Rheinische Braunkohlenwerk, A.G. Rheinbraun U.S. Corporation,

and Maria Theresia Bergbaugesellschaft, MBH.

Kathryn L. Simpson (argued), Vincent J. Grogan, Grogan, Graffam, McGinley & Lucchino, Pittsburgh, PA, for Ewing Pollock and Law Firm of Pollock, Pollock, and Thomas.

Joseph D. Becker, Becker, Glynn, Melamed & Muffly, New York City, for Rhein Braun U.S., and Maria Theresia Bergbaugesellschaft, MBH.

James F. Manley, Burns, Manley & Little, Pittsburgh, PA, for David Boggs, Upshur Agency, Inc.

Before: BECKER, HUTCHINSON, and ROTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is the second time this case has been before us. *See Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 617–18 (3d Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992). Plaintiffs were owners of rural land in southwestern Pennsylvania which they sold for the construction of a railroad to service a major new coal mining operation. Defendants include the coal and railroad companies that were involved in the venture, the realty company that assisted in the acquisition of the land, individual employees of the realty company, and a lawyer (along with his law firm) who handled the land closings for the purchasers, but who also gave legal advice about one of the land transactions to a plaintiff seller.[1] The jury found that the defendants conspired to procure, through fraud, the plaintiffs' land at unfairly low prices, that the lawyers had committed malpractice, and that various defendants also were liable for common law fraud and federal civil RICO violations. They made large compensatory and punitive damage awards.

Following the jury verdicts, but before entry of judgment on those verdicts, the district court sua sponte dismissed the legal malpractice claim. On February 25, 1987, the court entered judgments on the verdict for the plaintiffs. Responding to various post-trial motions, the court vacated, then reinstated, and then re-vacated the RICO judgments. The court also vacated the jury award in its entirety and ordered a new trial on damages. After several more procedural twists and turns, a retrial was held on both punitive and compensatory damages, and new damage awards were entered in favor of the plaintiffs.

On appeal, this court reversed, holding, inter alia, that: (1) the district court had abused its discretion in setting aside the first damage award and ordering a new trial on damages; (2) the first award of punitive damages was supported by the record; (3) the malpractice verdict against the attorneys should be reinstated; and (4) the district court properly granted judgment n.o.v. on the civil RICO claims. *See id.* at 617–18. Our judgment, entered on December 30, 1991, vacated the judgments entered on the second damage awards and remanded the cases to the district court "with instruction to reinstate the first awards returned by the jury."[2]

The ten appeals and cross-appeals currently before us present three questions. First, under 28 U.S.C. § 1961, does post-judgment interest run from the original February 25, 1987 judgment, or from the more recent date of our (previous) appellate mandate? Second, should the individual punitive damage awards be imposed on the defendant co-conspirators jointly and severally? Third, does the jury's verdict, which found that 100% percent of plaintiff Dorothy Loughman's compensatory damages were due to malpractice, mandate that the compensatory damages awarded her be entered solely against

---

1. We collectively refer to the parties to the coal mining venture, along with Monongahela Railway, as the Consol defendants. Additionally, we refer to the attorney, Ewing Pollock, and his law firm jointly as "the Pollock defendants" or "the lawyers."

2. A more extensive review of the background facts may be found in our earlier opinion. *See Hughes*, 945 F.2d at 607–09.

the lawyers, notwithstanding that all of the defendants, except Reese and Wilson, were found liable for civil conspiracy and a number were found liable for common law fraud?[3]

Because this court's remand order essentially reinstated the initial judgments, the essential liability and damage elements of which had been ascertained by the jury in the initial proceeding, we will affirm the order of the district court awarding post-judgment interest from the date the first judgments were entered. We will also affirm the order of the district court rejecting plaintiffs' claim that liability for punitive damages should be joint and several. A review of the jury instructions demonstrates that the punitive damages issue was submitted and the verdict rendered on an individualized basis against the various defendants, and we find no basis for the contention that a case should not be tried in this manner.

We will, however, reverse the district court's order entering judgment against solely the Pollock defendants on Loughman's compensatory damages. The court must harmonize a jury's responses to interrogatories if possible. Here, however, the district court failed to do so, largely on the understanding that the plaintiffs had waived their right to complain. We conclude, however, that if a harmonizing interpretation can be given, then there was no obligation to raise the inconsistency in the first place, and hence no waiver.

Our review of the jury instructions in conjunction with the answers to interrogatories leads us to conclude that the jury's findings may be harmonized. Specifically, we conclude that the jury's finding that 100% of the loss was attributable to malpractice was an alternative manner of stating its conclusion that the malpractice was a "but for" cause of Loughman's loss, which the jury was instructed it must find in order to hold the Pollock defendants liable for malpractice. There may be more than one but for cause of a loss, and in finding all of the defendants liable for civil conspiracy the jury necessarily found that this conduct also was a but for cause of Loughman's loss. Accordingly, we will reverse and order that judgment be entered jointly and severally against all of the defendants that were found liable to Loughman for civil conspiracy.

## I. Procedural History

The first trial ended on February 23, 1987 in a jury finding that all of the defendants had engaged in a civil conspiracy, that a number of defendants were liable for fraud, that a number of defendants had violated the federal RICO statute, and that the attorneys were liable to Loughman for legal malpractice. The jury awarded the plaintiffs approximately $5,360,000 in compensatory damages. Of this amount, the jury awarded Loughman $1,450,000, but also provided in answer to an interrogatory that "[t]he percentage of this amount ... due to legal malpractice is: *100%.*" The jury also awarded punitive damages in varying amounts against all but four of the defendants, for a total of $5,500,000 in punitive damages.

The day after the jury returned its verdict, the district court conducted a post-trial conference at which, sua sponte, it dismissed the malpractice claim against the Pollock defendants. In addition, the court ruled that the plaintiffs were not entitled to both punitive damages and RICO's trebled compensatory damages, concluding that the two were duplicative. Instead, the court permitted each plaintiff to choose between the trebled compensatory award under civil RICO and the plaintiff's pro rata share of punitive damages plus their non-trebled compensatory damages.

---

**3.** All of the defendants were found liable for civil conspiracy. However, because this case is really a consolidation of independent cases brought by separate plaintiffs or groups of plaintiffs, not all defendants were sued by all plaintiffs (although the overwhelming number of defendants were common to all plaintiffs). In particular, neither Reese nor Wilson was named as a defendant in Loughman's complaint, and thus could not have been found liable as against Loughman.

On February 25, 1987, the district court entered judgment on the verdict in favor of the plaintiffs, entering individual judgments for each plaintiff or group of plaintiffs[4] against the applicable defendants. For those plaintiffs who had opted for trebled damages, the judgments provided a lump sum and indicated that the compensatory damages had been trebled, and no formal judgment on punitive damages was entered. The judgments did not identify which claims or theories supported the compensatory damage awards. For those plaintiffs who had elected punitive damages, a judgment was entered comprised of a general award of compensatory damages and an award of punitive damages against specific defendants, again without reference to the theory supporting that award.

Over the next few years the parties filed numerous motions, and the district court entered a series of orders in response. We chronicle the most relevant of these orders.

1. On October 22, 1987, the district court ordered that judgment n.o.v. be entered in favor of the defendants on the civil RICO claims and vacated the February 25, 1987 judgments. The court, however, denied defendants' motion for judgment n.o.v. as to the civil conspiracy and fraud claims. The court also considered the damage awards and concluded that they were "obscenely excessive," and "contrary to the great weight of the evidence." Accordingly, it ordered a new trial on both compensatory and punitive damages unless the plaintiffs agreed to a remittitur.

2. On May 17, 1988, based on an intervening decision by this court, the district court partially reversed its earlier decision. It vacated those portions of the October 22, 1987 order that had entered judgment n.o.v. in favor of the defendants on the civil RICO claims, determining that the plaintiffs had proved a "pattern of racketeering" and that the defendants were liable for violations of the civil RICO statute. The court's order, however, did not expressly enter new judgments in favor of the plaintiffs or reinstate the vacated February 25, 1987 judgments. Additionally, the court stated that the portion of the October 22, 1987 order requiring a new trial would not be vacated, but that the new trial on damages would continue as scheduled.

3. Another judge was assigned to the case, and on October 27, 1988, that judge reaffirmed the ruling made during the June 9, 1988 pretrial conference that punitive damages would not be submitted to the second jury in light of the reinstated trebled RICO award. As the parties prepared to move forward on retrial of the compensatory damages, the case was reassigned to a third judge.

4. On November 23, 1988, plaintiffs moved for class certification. On December 7, 1988, the district court denied plaintiffs' motion for certification on the ground that plaintiffs had failed so to move within 90 days of the filing of the complaint as required by Local Rule 34 of the United States District Court for the Western District of Pennsylvania.

5. On February 27, 1990, the district court announced that it would grant judgment n.o.v. in favor of the defendants on the RICO claims in light of an intervening Supreme Court decision. The court also ordered that, since RICO was once again out of the case, punitive damages would be retried along with compensatory damages. On March 1, 1990, the court filed a written opinion setting aside the RICO award. Again, however, no new judgments were entered.

6. On April 5, 1990, at the conclusion of the retrial on damages, the jury awarded the plaintiffs $4,262,677 in compensatory and $649,000 in punitive damages. On April 11, 1990, the district court entered judgments in favor of the plaintiffs for both compensatory

---

4. Since the present case is a consolidation of a number of independent cases, a separate judgment was entered in each case.

and punitive damages. The defendants subsequently moved for judgment n.o.v. or, in the alternative, a new trial, which motion was denied by the district court on June 29, 1990.

7. The first appeal was then filed and resolved. On July 2, 1992, following remand from this court, the district court entered judgments in favor of the plaintiffs. In conjunction therewith, the court made three rulings that frame the issues for this appeal. First, the court determined that post-judgment interest should run from February 25, 1987, the date of entry of judgments on the first jury verdict. Second, the court decided that the defendants were not jointly and severally liable for punitive damages, but that each defendant was liable only for those punitive damages specifically assessed by the jury against that defendant. Third, based on the jury's apparent determination that lawyer malpractice was the exclusive cause of Loughman's damages, the court concluded that the Pollock defendants alone were liable for Loughman's compensatory award of $1,450,000.

## II. *Post-judgment Interest*

### A. Introduction

The award of post-judgment interest is governed by 28 U.S.C. § 1961(a), which provides in relevant part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of entry of judgment.... [5]

5. *See also* Fed.R.App.P. 37:

> Unless otherwise provided by law, if a judgment for money in a civil case is affirmed, whatever interest is allowed by law shall be payable from the date the judgment was entered in the district court. If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest.

While not pressing the argument on appeal, in a footnote the defendants identify a potential Rule 37 issue. While expressing doubt as to whether or not Rule 37 applies, the defendants suggest that, because of our silence as to post-judgment interest in the first mandate, the district court may have lacked the power to award post-judgment interest from any point prior to the date of entry of our mandate in December, 1991.

Because the argument was not pressed, it has not been fully developed by the parties. At all events, we conclude that it makes no difference in the present case whether or not Fed.R.App.P. 37 applied to this court's original remand order. First, it is likely that we could consider (or reconsider) the issue of post-judgment interest on appeal since it is merely one aspect of a case properly before us on appeal from a final judgment. As commentators have said of a similar case involving post-judgment interest:

> Recall of mandate terminology may also be used in the intermediate situation of an appeal following a prior remand, in which the court of appeals is asked to modify or clarify its earlier disposition.... Since the case was properly before the court on appeal from a final judgment, resort to recall of mandate doctrine seems unnecessary. The question

could be approached simply in terms of the meaning of the original appellate disposition, and the policies that urge adherence to it. Charles Alan Wright et al., Federal Practice and Procedure § 3938, at 281 (1977).

Even if we were unable to consider this issue by means of appeal, our consideration of the issue would not necessarily be foreclosed. At a minimum, we have the authority to recall our mandate so as expressly to provide for the awarding of post-judgment interest. *See American Iron and Steel Inst. v. EPA*, 560 F.2d 589, 592, 592–94 (3d Cir.1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *see also Masinter v. Tenneco Oil Co.*, 934 F.2d 67 (5th Cir.1991) (granting motion to recall mandate where panel in first appeal had not given instructions on the allowance of interest); Fed.R.App.P. 37 advisory committee's notes ("Since the rule directs that the matter of interest be disposed of by the mandate, in cases where interest is simply overlooked, a party who conceives himself entitled to interest from a date other than the date of entry of judgment in accordance with the mandate should be entitled to seek recall of the mandate for determination of the question."). As the error, if any, was ours, we would sua sponte recall the mandate and, for the reasons discussed *infra*, order the award of post-judgment interest from the entry of the original judgments. *See Leroy v. City of Houston*, 906 F.2d 1068, 1075 (5th Cir.1990) ("On several occasions we have treated an appellate request for interest from the first judgment as allowing us to *sua sponte* recall our earlier mandate where we deemed that required in the interest of justice.").

At all events, because the issues were framed and argued by the parties in terms of our review of the district court's decision, we will address

The purpose of 28 U.S.C. § 1961 " 'is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant.' " *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835–36, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990) (quoting *Poleto v. Consolidated Rail Co.*, 826 F.2d 1270, 1280 (3d Cir.1987)).

The statute, however, clearly provides that the court may only accrue post-judgment interest from the date of the entry of judgment, "[e]ven though denial of interest from verdict to judgment may result in the plaintiff bearing the burden of the loss of the use of the money from verdict to judgment." *Id.*

The district court, satisfied that this court had in essence reinstated the original judgments, awarded post-judgment interest from the date of their first entry. The defendants, however, contend that there were no legally enforceable February 1987 judgments from which interest could accrue. They submit that the February 1987 judgments were defective when entered in that they were founded on an incorrect verdict of RICO liability and contained serious flaws in the assessment of damages. Additionally, they note that the judgments were vacated by the district court on December 22, 1987, and were never formally reinstated.

Defendants also assert that the February 1987 judgments cannot serve as the basis for the accrual of post-judgment interest because those judgments failed to reflect any meaningful resolution of fundamental issues in the case. In their submission, "basic questions of liability on the federal RICO claims and availability of punitive damages were hotly disputed by plaintiffs and defendants alike, were resolved several different ways by the district court and were not meaningfully resolved until this court entered judgment in December 1991." Moreover, they contend

that not even the plaintiffs viewed the judgments as enforceable or as settling fundamental issues because they moved for class certification well after the February, 1987 judgments had been vacated. Finally, defendants point out that judgment was never entered on the malpractice claims because the district court granted judgment n.o.v. as to that claim before entry of the judgments.

In sum, the defendants maintain that inasmuch as: (1) the 1987 judgments were properly vacated and never reinstated; (2) this court affirmed the district court's holding that the RICO judgments were insufficient as a matter of law; and (3) basic issues remained unresolved between February, 1987 and December, 1991, no judgment upon which interest could accrue existed before December 20, 1991, when this Court issued its mandate ordering the district court to reinstate the jury award. Our scope of review of the district court's challenged order is plenary. *Dawson v. United States*, 894 F.2d 70, 72 (3d Cir.1990).

B. Discussion

■ While the defendants' arguments are not without some force, we conclude that they primarily serve to becloud the real issue, and are ultimately unavailing. The standard for determining whether post-judgment interest should run from the original judgment is well established. Specifically, the decision turns on the degree to which the original judgment was upheld or invalidated on appeal. *See, e.g., Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir.1991) ("[T]he extent to which a judgment is invalidated on appeal determines whether the first judgment or the remand judgment triggers the accrual of postjudgment interest."); *Cordero v. De Jesus–Mendez*, 922 F.2d 11, 16 (1st Cir.1990) ("In general, where a first

---

the case within that procedural posture. We stress, however, that the analysis would be the same were we to recall the mandate and consid-

er the award of post-judgment interest on a clean slate.

judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment; where the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment.").

This same approach, but in the context of an issue that had never been appealed, is applied in the Supreme Court's decision in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). There, the Court held that, where the district court set aside the first jury's findings on damages because they were not supported by the evidence and that decision was never appealed, post-judgment interest could not accrue from the judgment entered on that first jury's findings:

> Where the judgment on damages was not supported by the evidence, the damages have not been "ascertained" in any meaningful way. It would be counterintuitive, to say the least, to believe that Congress intended postjudgment interest to be calculated from such a judgment.

*Id.* at 836, 110 S.Ct. at 1576.

While the general standard is well formulated, its application in particular cases is often very fact specific. At one factual extreme, it is clear that if the original judgment is affirmed in whole, such as where the court of appeals reverses the district court's grant of judgment n.o.v. and orders the original judgment reinstated in its entirety, post-judgment interest will accrue from the date of the first judgment. *See, e.g., Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir.1988) (discussing "a line of cases holding that if a plaintiff wins a jury verdict, the trial court enters a judgment n.o.v. for defendant, and the appellate court reverses and remands with instructions to enter judgment on the original verdict, then postjudgment interest runs from the entry of the original judgment"). At the other extreme are cases in which the original judgments are reversed completely. In these cases, post-judgment interest will not begin

accruing until the later judgment. *See, e.g., Kaiser Aluminum*, 494 U.S. at 836, 110 S.Ct. at 1576 ("Where the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way."); *Federal Deposit Ins. Corp. v. Rocket Oil Co.*, 865 F.2d 1158, 1161 (10th Cir.1989) ("In the present case, this court completely reversed the district court's determination of liability and substantive rights of the parties changing the determinative judgment for purposes of postjudgment interest.").

Those cases that fall between the extremes present more difficult questions. With cases in the middle, the analysis essentially focuses on which of the two extremes the case resembles most. *Compare Coal Resources, Inc. v. Gulf & Western Indus.*, 954 F.2d 1263, 1275 (6th Cir.1992) ("Here, the damages awarded to Coal Resources[ ] were sufficiently ascertained at the time of the District Court judgment. The remittitur merely reduced the damages by a distinct amount easily determined from the facts of the case.") *with Wheeler*, 935 F.2d at 1097 ("Our reversal ... was not based upon minor liability errors or procedural oversights by the district court; rather, our disposition resulted from errors 'which affected the basic issues' of the trial.").

■ While we have found no case involving exactly the same factual and procedural circumstances of the present case, we believe that when the inquiry is distilled to its essence—the extent to which liability and damages, as finally determined, were ascertained or established in the first judgments—it becomes clear that the plaintiffs are entitled to post-judgment interest accruing from the date of the original judgment. It is undisputed that everything to which the plaintiffs are entitled was supported by the evidence at the first trial and was ascertained from the jury's verdict in that trial. As the plaintiffs point out, the original judgments directed the Clerk "to enter judgment on the verdict," not simply on the RICO counts. [App. 147–57] Thus, the judgments reflected liability and damages for the civil conspiracy and fraud claims, as well as for the RICO claims, and the evidentiary basis for liability on those claims was never upset by either the district

court or this court. All that the district court ever questioned regarding these claims was the evidentiary basis for the jury's finding as to the *amount* of damages. The district court's ruling on this issue, however, was reversed on appeal, with this court finding that the jury's original determination of damages was supported by the evidence and ordering that determination reinstated on remand.

In short, all that the defendants accomplished in the first appeal was the elimination of the RICO claims. All this did was eliminate one ground of liability. It did not affect the plaintiffs' ultimate right to recovery, nor the amount of that recovery, since the other bases for liability and compensatory damages, which were reinstated on remand, were reflected in the first judgments. Accordingly, the original judgments are the proper basis for the accrual of post-judgment interest on the compensatory damages.

■ The one wrinkle in regard to compensatory damages is the judgment entered for Loughman. While this judgment also necessarily encompassed civil conspiracy and fraud as a basis for liability, it did not include legal malpractice, since the district court sua sponte entered judgment n.o.v. on that theory *before* judgment was entered. Additionally, the district court on remand determined that all the compensatory damages to which Loughman was entitled flowed solely from the legal malpractice. If this set of circumstances were to remain unchanged on this appeal, it would be doubtful that Loughman could recover post-judgment interest from the February 1987 judgment, since the judgment did not include the putative sole basis for her recovery of compensatory damages, the legal malpractice. However, we conclude, *infra* Part IV, that the damages to which Loughman is entitled were not premised solely on legal malpractice, but included damages for civil conspiracy and common law fraud. The original judgment entered in Loughman's favor therefore included theories of liability that supported her award of compensatory damages. Since the essential liability and compensatory damages issues were "ascertained" in a meaningful way in the original judgment, the fact that the dis-

trict court sua sponte entered judgment n.o.v. on the malpractice claim, thereby eliminating one of the bases of liability, will not prevent post-judgment interest as to compensatory damages from accruing as of the date of entry of the original judgment.

■ We also conclude that the first judgment reflected liability for punitive damages, and that the amount was sufficiently ascertained at that time to permit the accrual of post-judgment interest from the entry of the first judgment. In the defendants' view, punitive damages were never included in the original judgments except as to the two plaintiffs who elected punitive damages rather than trebled compensatory damages under RICO. As such, they argue, there was never a judgment entered that included the jury's findings on punitive damages until after remand from this court. We disagree.

The punitive damages were not explicitly provided for in the original judgment because, as the district court saw it, they were subsumed within the trebled damages awarded under RICO. The court refused to allow the entry of both punitive damages and trebled compensatory damages because it concluded that this would constitute double counting. In other words, the two were viewed as alternative *methods for calculating* the exemplary damages to which the plaintiffs were entitled. *See supra* at 94. Accordingly, the court determined that the appropriate procedure was to provide the plaintiffs the opportunity to choose between punitive and trebled damages. Since the trebled damages were, at least for those who chose them, much more substantial than the specific punitive awards, most plaintiffs opted for the trebled RICO damages. We think it fair to conclude therefore that the punitive damages were included in the first judgment, but were simply subsumed within the trebled damages in the same way that the various bases for compensatory damages were subsumed within one another.

■ Although, as noted above, there are no cases directly on point, the most analogous cases support this result. In particular, the case law is clear that when the essential legal and evidentiary basis for damages is

established, but the amount is recalculated after appeal, post-judgment interest accrues from entry of the first judgment. *See, e.g., Tinsley v. Sea–Land Corp.*, 979 F.2d 1382, 1383 (9th Cir.1992) (concluding that "damages were sufficiently ascertained as of the date of the original judgment where on appeal th[e] court ordered the district court to reduce the damage award in proportion to the plaintiff's comparative negligence."), *cert. denied*, —— U.S. ——, 114 S.Ct. 69, —— L.Ed.2d —— (1993); *Northern Natural Gas Co. v. Hegler*, 818 F.2d 730, 737 (10th Cir. 1987) ("This was a large dollar difference but the reversal was not on any basic liability errors or errors in procedure which affected the basic issues but on a dollar value, a matter of degree."), *cert. dismissed*, 486 U.S. 1063, 109 S.Ct. 7, 100 L.Ed.2d 937 (1988); *see also H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 261–62 (8th Cir.1991) (affirming district court's award of post-judgment interest on portion of damages affirmed on prior appeal even though the case was initially remanded for new trial on merits and on compensatory and punitive damages in connection with the tortious interference claim, which claim was abandoned on remand).

C. Conclusion

In sum, all that the defendants accomplished in the first appeal was the elimination of the RICO claims. In affirming the district court's decision that a RICO violation had not been proved, we did not affect the plaintiffs' ultimate right to recovery. Our prior decision did no more than eliminate one ground for liability and substitute one damages remedy for another, leaving the amounts of compensatory damages wholly unchanged and merely altering the method by which the amount of exemplary damages were calculated. Accordingly, we agree with the district court that liability and damages were ascertained in a meaningful way in the original judgment and that our appellate

mandate maintained the essential elements of that judgment. We will therefore affirm the district court's determination that post-judgment interest began to accrue from entry of the February 1987 judgments.

### III. *Joint and Several Liability for Punitive Damages*

The plaintiffs contend that the district court erred in refusing to assess punitive damages jointly and severally among the defendants. They note that each defendant was found liable for civil conspiracy and that the general rule is that each conspirator is jointly and severally liable for all damages resulting from a conspiracy. From this they argue that each defendant is necessarily jointly and severally liable for all punitive, as well as compensatory, damages.

The plaintiffs, however, cite no applicable case law to support their conclusion, and the plaintiffs' second proposition, that punitive damages must be imposed jointly and severally, does not necessarily follow from the first. It is one thing to hold a conspirator liable for all harm (compensatory damages) done by the conspiracy. It is quite another, substantial step to impose joint and several liability for the award of punitive damages, which serve a very different purpose. "Unlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, the purpose of imposing punitive damages is to punish the wrongdoers and to deter future conduct." *Feingold v. Southeastern Pa. Transp. Auth.*, 512 Pa. 567, 517 A.2d 1270, 1276 (1986); *accord Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1277 (3d Cir.1979) (in banc); *Delahanty v. First Pa. Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1262–63 (1983).

The parties have extensively briefed the appropriateness and availability of joint and several liability for punitive damages under Pennsylvania law.[6] While the question is

6. While we do not decide the question, we note that there are strong policy arguments against permitting the entry of joint and several liability on punitive damages. The Second Circuit has set forth the argument most cogently:

The effect of joint liability in a tort context is to excuse one defendant from paying any portion

of the judgment if the plaintiff collects the full amount from the other. While this possibility is not necessarily undesirable with respect to a judgment awarding compensatory damages, it is contrary to the policies underlying an award of punitive damages. The latter award is intended in part as a penalty against a defendant

interesting, regardless of whether punitive damages *may* be assessed jointly and severally under Pennsylvania law, we have found no currently applicable law suggesting that they *must* be awarded jointly and severally. *See, e.g., Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 389 (E.D.Pa.1982) (noting that modern Pennsylvania practice encourages the joinder of joint tortfeasors in a single suit but with the ability to receive individual judgments against each, including for punitive damages), *aff'd sub nom., Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481 (3d Cir.1985); *see also McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984) ("The assessment of punitive damages against individual defendants creates no problem; punitive damages, like criminal fines, which they resemble, are always assessed individually.").

Here, the jury instructions clearly demonstrate that the issue of punitive damages was submitted to the jury on the theory that they would be assessed and awarded on an individual basis against the defendants. Specifically, the jury was instructed:

> You must determine whether punitive damages are to be assessed against each defendant by that defendant's conduct alone, and the amount of any punitive damages assessed must be measured by your consideration of the factors which I have enumerated as they apply to each particular defendant.
>
> While you will return your award of compensatory damages, if any, in one lump sum amount as to all defendants, you must return a separate verdict as to punitive damages, if any, against each of the defen-

dants, because you have to consider these factors which differ as to each defendant. The court also instructed the jury that in making the awards it should consider a number of factors, including how outrageous the conduct of the individual defendant was, the nature and extent of the harm caused or intended to be caused, and the wealth of the particular defendant, as it bore on the amount necessary to punish and deter that defendant.[7]

Additionally, there was wide variation in the punitive damages awarded against the various defendants, which reflects the seriousness with which the jury took these instructions. The punitive damages in this case were clearly awarded by the jury on an individualized basis. Since the case was tried on the theory that punitive damages would be awarded individually and since there was no legal bar to trying the case in that manner, the order of the district court in this respect will be affirmed.

■ Plaintiffs also make a more limited, but related argument in an effort to spread the liability for the payment of punitive damages.[8] The argument is predicated on defendants Upshur Agency and David Boggs being agents of defendants Consol, Monongahela, and Rheinbraun. Under Pennsylvania law a principal may be held vicariously liable for the punitive damages of its agents if the actions of the agent were "clearly outrageous," were committed during and within the scope of the agent's duties, and were done with the intent to further the principal's interests. *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1264 (1983). Thus, the plaintiffs submit, since these defendants were found to have acted

---

who has exhibited a high degree of moral culpability and as a deterrence against further similar conduct by that defendant. Those interests are disserved if the judgment gives such a defendant an opportunity to escape payment of the penalty assessed. Thus imposition of joint liability for a punitive damage award is improper.
*Smith v. Lighting Bolt Prods., Inc.,* 861 F.2d 363, 374 (2d Cir.1988).

7. To the extent that the plaintiffs now assert that it was legal error for the court to have instructed the jury in this manner, that avenue of argument is foreclosed by their failure to object at the time

the instruction was given. *See* Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."). Additionally, we see no basis for an assertion that this instruction constituted plain error.

8. We note in this regard that defendant Upshur Agency is in bankruptcy, and that some defendants obviously have "deeper pockets" than others. Thus, the plaintiffs have a significant interest in being able to seek recovery from additional defendants.

outrageously and were clearly the agents of the defendant-principals, the defendant-principals should be held liable for the punitive damages awarded against their agents.

 Again, however, the relief the plaintiffs seek through this argument is foreclosed by the jury instructions. The court's charge to the jury on this point provided:

> While you will return your award of compensatory damages, if any, in one lump sum amount as to all defendants, you must return a separate verdict as to punitive damages, if any, against each of the defendants, because you have to consider these factors which differ as to each defendant.
>
> . . . .
>
> Plaintiffs claim that defendants Boggs, Reese and Wilson were the agents of the remaining defendants. It is for you to determine from all of the evidence the nature of the relationship then and there existing among the defendants.
>
> If the conduct of an agent is outrageous, punitive damages may be awarded against the principal if the principal authorized the doing and the manner of the act, or the agent was unfit and the principal was reckless in employing him, or the agent was employed in a managerial capacity and was acting in the course of his employment, or the principal or another agent of the principal employed in a managerial capacity ratified or approved the act, or the agent's act was foreseeable.

The jury thus was explicitly instructed that one additional factor to be considered in making its individualized awards of punitive damages was the degree to which a principal should be held accountable for the outrageous conduct of its agents. Thus, even assuming that the jury found that some of the defendants were vicariously liable for the punitive damages of some of the agents,[9] the appropriate manner for the jury to have accounted for these punitive damages, under the instructions, was to include the punitive damages chargeable to the agent's outrageous conduct within the individualized awards assessed against the specific defendant principals. We have no reason to doubt, but rather must assume, that it did so. *See United States v. Zauber,* 857 F.2d 137, 154 (3d Cir.1988) ("A jury is presumed to have acted rationally. We must assume that the jury followed the court's instructions and arrived at a verdict based on those instructions."), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989).

For all the foregoing reasons, we will affirm the district court's order rejecting plaintiffs' claim that punitive damages should be entered against the defendants jointly and severally.

## IV. *Joint and Several Liability as to the Compensatory Damages Awarded Plaintiff Loughman*

In the third and final issue on appeal, plaintiff Loughman and the Pollock defendants join to argue that the compensatory damages awarded Loughman should have been entered as a lump sum against all of the defendants jointly and severally, as was done with regard to all other plaintiffs, rather than solely against the Pollock defendants. Specifically, Loughman and Pollock point out that all of the defendants except William Reese and Mike Wilson, against whom Loughman made no claims, were found by the jury to have participated in a civil conspiracy to defraud Loughman.[10] Moreover, Loughman and Pollock note that the purchase of every piece of land along the railway right-of-way was needed to achieve the ultimate object of the conspiracy, and that Pol-

---

9. Because no interrogatory was submitted on this issue, there is now no way for us to determine which, if any, defendants the jury found liable for which agent's punitive damages.

10. Additionally, defendants Consol–Pennsylvania Coal, Monongahela, David Boggs, Ewing Pollock, Upshur Agency, Consolidated Coal, and Consol–Land were found to have defrauded Loughman. With the exception of Pollock, each of these defendants was also found to have de- frauded each and every other plaintiff. Pollock, however, was found to have defrauded only Loughman. Finally, the jury found that the conduct of Consol–Pennsylvania, Monongahela, Boggs, Pollock, the Pollock law firm, Upshur Agency, Consolidated Coal, and Consol–Land, respectively, was sufficiently outrageous with respect to Loughman to warrant the awarding of punitive damages.

lock's conduct in connection with Loughman was an overt act in furtherance of that conspiracy. Since the law of conspiracy establishes that every conspirator is jointly and severally liable for all acts of co-conspirators taken in furtherance of the conspiracy, they conclude that all of the defendants are, perforce, accountable for whatever damages were caused by Pollock's malpractice.[11]

The remaining defendants,[12] however, contend that this argument cannot stand in light of the jury's explicit finding that Pollock's malpractice was the sole cause of Loughman's damages. In Part F of the Verdict Form, the jury was asked to set out the "amount of compensatory damages (if any) to be awarded to" each individual plaintiff or group of related plaintiffs. Interrogatory 59 relates specifically to Loughman and provided a blank in which the jury set out the total amount of compensatory damages to which Loughman was entitled. Then, in a question unique to interrogatory 59, the jury answered as follows:

A. The percentage of this amount, if any, due to legal malpractice is:

<u>100%</u>

█ The defendants contend that this answer makes clear that the jury found that malpractice was the sole cause of the harm to Loughman. First, the defendants argue that regardless of whether this answer is consistent with the rest of the verdict, Loughman and the Pollock defendants are bound by the district court's construction of the verdict because, under Fed.R.Civ.P. 49 or 51, they have effectively waived their right to complain by failing to object to the instructions or interrogatories, failing to suggest different or additional interrogatories, and failing to seek to have the verdict reconciled or clarified while the jury was still empaneled. Alternatively, the defendants argue that the jury's answers to interrogatories are consistent and that the judgment entered by the district court was a rational construction of those harmonious answers.

To the extent that the defendants' argument is premised on the parties' failure to object to the instructions or interrogatories under Fed.R.Civ.P. 51, we are unpersuaded. The question before us is not whether there was error in the instruction or in the interrogatories, but the legal effect of the jury's answers, and, more specifically, whether the jury's answers can be reconciled. We agree, however, that if there is an inconsistency in those answers, the failure of plaintiffs to object might create serious problems under Fed.R.Civ.P. 49.

Rule 49 provides a court with alternatives to submitting a case under a traditional general verdict. Rule 49 is split into two subsections, subsection (a), which provides for the use of special verdicts,[13] and subsection (b),

---

**11.** The facts of Pollock's malpractice are set out succinctly in our prior opinion. *See Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 616–17 (3d Cir.1991). Stated briefly, Loughman received an offer on her property from an Upshur agent, who claimed to be representing Monongahela. When Loughman rejected the offer, the agent threatened that Monongahela would condemn the necessary portion of the property at an even lower price if Loughman refused to accept the offer. Greatly concerned, Loughman called Pollock, who had been the Loughman family lawyer for many years, for legal advice. At the time, Pollock was working for the Consol defendants in connection with their acquisition of land for the railway. Pollock, however, failed to inform Loughman of the conflict, and, without inquiring as to the price she was offered, told her that he knew Monongahela to be fair in these matters and that she did not need an attorney to negotiate the matter for her. *See id.* As we explained in *Hughes,* "[s]ince Loughman testified that she agreed to sell only after she had consult-

ed with Pollock, his advice and representations proximately caused her lost profits." *Id.*

**12.** For the balance of this Part of the opinion, when we refer to "the defendants," we mean all the defendants except the Pollock defendants, which, of course, are on the opposite side of this issue.

**13.** Fed.R.Civ.P. 49(a) provides, in relevant part:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

which provides for the use of a general verdict to be accompanied by written interrogatories.[14] The defendants argue that regardless of which subsection applies, Loughman and the lawyers' arguments are foreclosed.

If the case was submitted on special verdicts, pursuant to Rule 49(a), the defendants contend that, because Loughman and the lawyers did not submit any question about joint and several liability in connection with the legal malpractice claim, the district court was permitted to make its own finding with regard to that issue, which it did consistent with the law and the remainder of the jury's answers. Alternatively, the defendants submit that the issue was covered by Question A of Interrogatory 59 and that the district court rendered a judgment that endorsed the jury's already harmonious answers or provided a rational and at least minimally plausible view of those answers, which bars speculation by Loughman and the Pollack defendants as to what other harmonious explanations might exist.

If, however, the case was submitted on a general verdict accompanied by answers to interrogatories, pursuant to Rule 49(b), then the defendants assert that Loughman and the attorneys waived any purported inconsistency in the answers to interrogatories by failing to raise them prior to the dismissal of the jury.[15] Alternatively, the defendants submit that the jury's specific finding that the malpractice was the sole cause of Loughman's injuries trumps any inconsistent general verdicts.

The critical question here is whether the jury's answers in the verdict are necessarily inconsistent with each other.[16] More specifically, we must first determine whether the district court's construction of the verdict harmonized the jury's answers. If it did not, then we must determine whether, as Loughman and Pollock assert, the jury's findings on civil liability and fraud may be reconciled with its finding that 100% of Loughman's damages were due to legal malpractice.

 First, we note that a district court must render a judgment that makes the jury's answers consistent if such a construction is possible. *See McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763–64

---

14. Fed.R.Civ.P. 49(b) provides, in relevant part:

The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict.... When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answer and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

15. The defendants waiver argument is premised on the statement in *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1056–57 (3d Cir.1991) (Becker, J., opinion announcing the judgment of the court), *cert. denied,* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992), that:

In this circuit, it probably is necessary, as it is in the majority of the circuits, to raise prior to

the jury's dismissal an objection based on the inconsistency of the answers to interrogatories supporting a general verdict rendered under Rule 49(b).

While this statement may well be correct, we note that it is, by its own language, a tentative conclusion. Moreover, the statement was not a "holding" of the opinion since the interrogatories were viewed as having been submitted under Rule 49(a) rather than Rule 49(b). Additionally, Part II of the opinion, from which this statement is drawn, was not joined by any other member of the panel, and therefore cannot, in any case, be considered a holding of the court or be considered binding on future panels of this court, *see* Internal Operation Procedure of the Third Circuit Court of Appeals 9.1.

16. In this case, as in many cases, it is not entirely clear whether the verdict is governed by Fed. R.Civ.P. 49(a) or 49(b). *See, e.g., Simmons*, 947 F.2d at 1057–58 (Becker, J., opinion announcing the judgment of the court); *Stanton v. Astra Pharmaceutical Prods., Inc.*, 718 F.2d 553, 574–75 (3d Cir.1983). However, because we conclude that the verdict can be harmonized based on the jury's answers to the questions submitted, we never reach the issue of whether this was a special verdict or a general verdict with interrogatories.

(3d Cir.1990).[17] Here, we conclude that the district court's construction of the judgments cannot stand because it does not successfully harmonize, or provide a minimally plausible explanation, for the jury's findings. The district court theorized that the jury had found that the defendants engaged in a civil conspiracy but had concluded that that conspiracy had not damaged Loughman. This explanation, however, is untenable in light of the instructions given the jury.

▇ In its charge on civil conspiracy, the court instructed the jury:

Plaintiffs are required to prove each of the following in order to prevail on this claim: (1) the existence of some object to be accomplished; (2) an agreement among the alleged conspirators on the course of action to be taken; (3) one or more overt acts in furtherance of the alleged conspiracy; and (4) *that the plaintiffs suffered damages as a result thereof.*

(emphasis added). The jury's verdict cannot be reconciled by assuming that the jury failed to follow the court's instruction in arriving at its verdict. To the contrary, we must assume that the jury understood and followed the court's instructions. *See, e.g., Zauber,* 857 at 154; *United States v. Restaino,* 405 F.2d 628, 630 (3d Cir.1968), *cert. denied,* 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969). Accordingly, any har-

monization of the jury's answers must account for a finding that Loughman was damaged by the civil conspiracy.[18] The district court's construction plainly does not account for that finding. Accordingly, the defendants' argument that the judgment rendered by the district court represented a rational, consistent construction of the jury's answers must fail.

We must therefore determine whether the jury's conclusion that the conspirators damaged Loughman can be reconciled with its finding that Loughman's damages were 100% due to the Pollock defendants' malpractice. We conclude that such an explanation exists. The essential flaw in the defendants' argument is the assumption that the jury's finding that Loughman's damages were 100% "due to legal malpractice" means that the malpractice was the *sole* cause of those damages. There is, however, an alternative, and we believe more sensible, explanation of the jury's answer; namely, that Pollock's malpractice was a "but for" cause of Loughman's losses in the sense that, had Pollock not committed the malpractice, she would not have accepted the fraud-laden offer for her property.

This explanation is supported by the jury charge on malpractice. The jury was instructed:

To award damages to the plaintiff on this claim, you must find that the following

---

**17.** In *McAdam,* we explained more fully the limits of the district court's authority in molding a judgment from a jury's verdict:

What both appellants fail to recognize, however, is the very limited discretion a court has in molding a jury's answers to special interrogatories.... "[A] verdict must be molded consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers." Thus, a trial court is "under a constitutional mandate to search for a view of the case that makes the jury's answers consistent."

Thus, our role as an appellate court is limited to determining, after plenary review, whether the district court's molding of the jury's answers is a minimally plausible "view of the case."

*Id.* (citations omitted; emphasis original to *McAdam* court); *see also Andrasko v. Chamberlain Mfg. Corp.,* 608 F.2d 944, 947 (3d Cir.1979) ("The trial court must attempt to harmonize the jury's answers to interrogatories, if it is possible to do so under a fair reading of them.").

**18.** The same argument applies with regard to the jury's finding of fraud. The jury was instructed that it could find a defendant liable for fraud only if, among other elements, "the plaintiffs rely on the misrepresentations; and the plaintiffs' reliance on [the] defendant's misrepresentations *was a substantial factor in bringing about the harm suffered by the plaintiffs.*" Again, we must assume that the jury followed this instruction and found that the fraud was a substantial factor in causing Loughman's damages.

Similarly, the jury was instructed on punitive damages that each defendant must be considered individually and that "[t]he amount you assess as punitive damages must bear a reasonable relationship to the amount you choose to award as compensatory damages." Since punitive damages were assessed against a number of defendants in addition to Pollock for their conduct towards Loughman, *see supra* n. 10, we must assume that the jury found that those defendants injured Loughman.

elements have been established by a preponderance of the evidence: (1) that Ewing Pollock undertook to provide legal services on plaintiff's behalf; (2) that Ewing Pollock failed to exercise ordinary skill, knowledge and judgment in rendering these legal services; (3) that Dorothy Loughman suffered monetary injury; and (4) that Dorothy Loughman would not have suffered monetary injury *but for* Ewing Pollock's failure to exercise the skill and knowledge required of him under the law.[19]

Thus, in finding Pollock liable for legal malpractice, the jury necessarily concluded that "but for" the fact that Pollock failed adequately to advise Loughman, she would not have taken the fraudulently low sales price for her land. The jury then was faced with a question requiring it to state what percentage of the loss was caused by the legal malpractice. It logically follows from the jury's determination of liability for malpractice, by which it necessarily concluded that there would have been no loss but for the malpractice, that the loss that eventually resulted was 100% "due to legal malpractice."

It does not necessarily follow, however, that the jury also concluded that the malpractice was the *sole* cause of the loss. As both tort law and common sense tell us, there may be multiple but-for causes of a single loss and each, as a but-for cause, may be responsible for the entire loss in the sense that had that party not acted as it did, there would have been no loss.

As explained in the Restatement (Second) of Torts:

Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division.... Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm....

Such entire liability ... is imposed where either cause would have been sufficient in itself to bring about the result, as in the case of merging fires which burn a building. It is imposed also where both are essential to the harm, as in the case of [two negligently driven vehicles colliding and killing a bystander].

It is not necessary that the misconduct of two or more tortfeasors be simultaneous. One defendant may create a situation upon which the other may act later to cause the harm. One defendant may leave combustible material, and the other set it afire; one may leave a hole in the street, and the other drive into it.

Restatement (Second) of Torts § 433 A, cmt. i (1965); *see also* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 52, at 347–48 (5th ed. 1984). Pennsylvania has expressly adopted the Restatement's approach to the apportionment of damages for indivisible injuries. *See Martin v. Owens–Corning Fiberglas Corp.*, 515 Pa. 377, 528 A.2d 947, 949 (1987) ("The rules in this Commonwealth governing the apportionment of damages are consistent with those expressed in the Restatement (Second) of Torts...."); [20] *see also Corbett v. Weisband*,

---

**19.** This requirement was later reiterated by the court:

You must then decide ... whether [Pollock's] negligence was a legal cause of the plaintiff's injuries. In order for the negligent conduct to be a legal cause, you must find that Dorothy Loughman *would not have suffered a monetary loss but for* the negligence of Ewing Pollock.

**20.** The Pennsylvania Supreme Court then went on to quote verbatim the language of Restatement (Second) of Torts § 433 A, which provides:

§ 433 A. Apportionment of Harm to Causes
(1) Damages for harm are to be apportioned among two or more causes where
(a) there are distinct harms, or
(b) there is a reasonable basis for determining the contribution of each cause to a single harm.
(2) Damages for any other harm cannot be apportioned among two or more causes.
Restatement (Second) of Torts § 433 A, *quoted in Martin*, 528 A.2d at 949.

380 Pa.Super. 292, 551 A.2d 1059, 1076 (1988) (applying the principles of the Restatement (Second) of Torts § 433 A, cmt. i).

The present case presents such an indivisible injury. As discussed *supra*, in adhering to the court's charge, the jury necessarily found that both the conspiracy to commit fraud (for which all defendants except Reese and Wilson are liable) *and* Pollock's malpractice combined to cause Loughman to accept the price offered for her property. It is impossible to apportion Loughman's loss between these causes, however, because both were necessary precursors to the ultimate single, indivisible harm.

In sum, the jury's finding that 100% of the loss was attributable to malpractice was merely its alternative way of saying that malpractice was a "but for" cause of the loss, as the jury was instructed it must find in order to hold the Pollock defendants liable for malpractice.[21] Under this interpretation, there is no inconsistency within the interrogatory answers and hence the putative Rule 49 problem, whatever its incarnation, disappears.[22] *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); *Barnhart v. Dollar Rent A Car Sys., Inc.,* 595 F.2d 914, 917 (3d Cir.1979).[23] Therefore, we will reverse and remand with direction for the district court to enter judgment for Loughman's compensatory damages jointly and severally against all defendants except Reese and Wilson.

## V. *Conclusion*

The various appeals and cross-appeals in this case have raised three substantial challenges to the rulings of the district court. First, the defendants challenge the district court's order awarding post-judgment inter-

21. We also reject the defendants final argument—that the arguments of Loughman and the Pollock defendants are waived under Fed. R.Civ.P. 51 because they failed to submit a jury instruction on joint and several liability for *malpractice*. This argument is strained at best. It is a mischaracterization of the appellants' argument to say that they are seeking joint and several liability on malpractice, per se. What they seek instead is recognition of the defendants' liability for the jury's findings on civil conspiracy and common law fraud.

22. The plaintiffs also offer a possible alternative explanation, namely that the malpractice was an overt act in furtherance of the conspiracy, and as such, even if it were the sole cause of Loughman's damages, all of the conspirators would be jointly and severally liable for the actions and harm caused by co-conspirator Pollock. Although this argument is quite plausible and would reconcile the jury's answers, we are hesitant to rely on it because there is no conclusive way to determine whether or not the jury found the malpractice to be an overt act in furtherance of the conspiracy. A separate interrogatory was not submitted on this issue, and at least arguably the court made an implied finding under Rule 49(a) that the malpractice was independent of the conspiracy. *See* Fed.R.Civ.P. 49(a) ("If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so

omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.").

23. In *Barnhart,* the district court had refused the defendant's request for a set-off on the ground, among others, "that the burden of requesting clarification of an ambiguous finding of fact rests upon the complaining party, and such request must be made while the jury remains impanelled." *Barnhart,* 595 F.2d at 918. We reversed, explaining:

> As we have noted, the jury's findings are susceptible of only one internally consistent interpretation. When the jury was dismissed Dollar was justified in believing that the jury had found an oral modification of the original contract. The district court's refusal, five days later, to credit the jury's answer to question eight apparently was the first indication to Dollar that the court believed the determination to be one of law.
>
> Because a court must interpret a jury's findings of fact as consistent whenever possible, we believe that the district court erred in shaping its judgment in this case. The jury necessarily found that Dollar was entitled to its claimed set-off.

*Id.* at 919.

est from the date on which the original judgments were entered. Because we conclude that the portions of the original judgments reinstated on appeal reflected the jury's meaningful ascertainment of the essential components of liability and damages, both compensatory and punitive, we find that interest was properly ordered from the date of the original judgments.

Second, plaintiffs argue that the district court should have entered judgment on punitive damages against the defendants jointly and severally. Because the jury instructions demonstrate that this case was submitted on the theory that punitive damages would be assessed individually and because there is no legal bar to trying the case in this manner, we will affirm the district court's order entering judgment on the punitive damages on an individualized basis.

Third, plaintiff Loughman and the Pollock defendants submit that the district court erred in entering Loughman's judgment on the compensatory damages solely against the Pollock defendants. Because we conclude that the district court failed to harmonize the jury's answers and because we believe that a harmonizing interpretation of the verdict that holds all the defendants jointly and severally liable for Loughman's compensatory damages exists, we will reverse and remand with direction for the district court to enter judgment for Loughman's compensatory damages jointly and severally against all defendants except Reese and Wilson.