**INTER MEDICAL SUPPLIES LIMITED, Plaintiff,**

v.

**EBI MEDICAL SYSTEMS, INC., Electro–Biology, Inc., and Biomet, Inc., Defendants/Counterclaimants.**

**ORTHOFIX, INC., and Orthofix S.r.l., Plaintiffs,**

v.

**EBI MEDICAL SYSTEMS, INC., Electro–Biology, Inc., and Biomet, Inc., Defendants/Counterclaimants.**

Civil Action Nos. 95–6035, 96–1047.

United States District Court, D. New Jersey.

Aug. 28, 1997.

Joel Schneider, Archer & Greiner, Haddonfield, NJ, Dennis P. Orr, Mayer, Brown & Platt, New York City, Stephen Marzen, Shearman & Sterling, Washington, DC, for Plaintiffs, Counterclaim–Defendants.

James J. Ferrelli, Duane, Morris & Heckscher, Cherry Hill, NJ, Arthur P. Kallares, Thomas E. Mixdorf, Fred R. Biesecker, Ice, Miller, Donadio & Ryan, Indianapolis, IN, Richard D. Harris, John S. Pacocha, Dick & Harris, Chicago, IL, for Defendants, Counterclaimants.

## OPINION

ORLOFSKY, District Judge:

This case was tried before a jury which returned a verdict in favor of the plaintiffs on their claims for breach of contract, breach of the duty of good faith and fair dealing, tortious interference with prospective economic advantage, tortious interference with contract, defamation, unfair competition, and violation of the Lanham Act. The jury awarded the plaintiffs compensatory damages in the amount of $48,000,000.00, and $100,600,000.00 in punitive damages. The jury separately awarded plaintiff, Inter Medical Systems Ltd., $875,399.00 in damages for goods sold and delivered. The jury also found in favor of the defendants on their counterclaims for breach of contract, breach of the duty of good faith and fair dealing, tortious interference with prospective economic advantage, and tortious interference with contract. The jury awarded the defendants $1.00 in damages on these claims. The jury also found in favor of defendant, EBI Medical Systems ("EBIMS"), on its claim for breach of certain

purchase order contracts, and awarded it $1.00 as a set-off against the claim of plaintiff, Inter Medical Systems ("IMS"), for goods sold and delivered.

Defendants have renewed their motion for judgment as a matter of law, made at the close of all the evidence, and have moved, in the alternative, for a new trial or remittitur of the jury's $100,600,000.00 punitive damages award. For the reasons set forth below, defendants' motion for judgment as a matter of law will be denied, and their alternative motions for a new trial or remittitur will be granted in part, and a remittitur of the punitive damages award to $50,000,000.00 will be ordered.

While these post-trial motions raise complex issues of law, many of which have been addressed by the court during the course of the trial of this case, one issue of particular interest not previously addressed requires this court to analyze the punitive damages award under New Jersey's Punitive Damages Act, which took effect on October 27, 1995. N.J. Stat. Ann. § 2A:15–5.14(a) (West Supp. 1997). There are no reported New Jersey cases construing this subsection of the Act, or applying it to a case such as this. Therefore, this court must predict, without the benefit of guidance from any New Jersey court, how to construe and apply the Act in these circumstances.

## I. Background

Orthofix, S.r.l., based in Milan, Italy, is a manufacturer of medical devices, including External Dynamic Axial Bone Fixator Systems, which are used in the treatment of severe fractures. These bone fixators attach to the bone through the skin, allowing the surgeon to manipulate the bone without repeated surgeries. The sale and distribution of these fixators form the subject matter of this litigation.

Plaintiffs, Orthofix S.r.l., Inter Medical Systems ("IMS"), a Cyprus-based marketing affiliate of Orthofix S.r.l. and a worldwide distributor of Orthofix products, and Orthofix, Ltd., based in London, England, are subsidiaries of Orthofix International B.V., which is based in the Netherlands. Orthofix International B.V., in turn, and Orthofix,

Inc., a Texas corporation, formerly American Medical Electronics, Inc. ("AME"), are wholly-owned subsidiaries of Orthofix N.V., which is a publicly traded corporation.

For many years, the exclusive distributor of Orthofix products in North America and the Caribbean Basin was EBIMS, a Delaware corporation, having its principal place of business in Parsippany, New Jersey. EBIMS is a wholly-owned subsidiary of Electro–Biology Inc. ("EBI"), which, in turn, is a wholly-owned subsidiary of defendant, Biomet, Inc. Orthofix, Inc. is currently the exclusive distributor of Orthofix bone fixators in the United States.

EBIMS began distributing Orthofix products under an exclusive agreement in 1983. This relationship was memorialized in a series of written agreements, most recently, an agreement (the "Distributor Agreement"), entered into between EBIMS and Orthofix S.r.l. on June 1, 1990, which expired on May 31, 1995. The claims and counterclaims in this action arise out of the termination of the Distributor Agreement and the events surrounding it. When it became clear that EBIMS would not be renewed as the exclusive North American distributor of Orthofix products, EBI/Biomet decided to develop external bone fixators which would compete directly with Orthofix's products. In an effort to maintain their commanding position as the leading United States marketer of external bone fixators until such time as their own products could be successfully launched, defendants attempted to secure a large inventory of Orthofix products. That plan was largely successful, and Orthofix is no longer a major force in the United States market for external bone fixation devices.

Following a two month trial, at which the jury heard more than 5000 pages of testimony and endured numerous lengthy hiatuses while the parties debated points of law, the jury deliberated for over two days before reaching the verdict described above. It would disserve the jury system and dishonor the contribution of this dedicated jury to that system were the verdict to be lightly overturned.

## II. Legal Standards

A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993) (citations omitted). The standard for deciding a motion for judgment as a matter of law under Rule 50(b) is the same as it is under Rule 50(a). 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537, at 347 (2d ed.1995). This court may not question the credibility of witnesses or weigh conflicting evidence on a motion for judgment as a matter of law. *See Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir.1993). Applying these principles, a renewed, post-verdict motion for judgment as a matter of law must be denied unless, viewing the evidence in the light most favorable to the verdict winner, "the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir.1992) (internal citations and quotations omitted). Not only the facts of record, but all reasonable inferences which might be drawn from those facts must be viewed in the light most favorable to the verdict winner. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir.1992).

The decision whether to grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) lies within the district court's sound discretion. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980); *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995). A new trial may be granted, on the basis that the verdict is against the weight of the evidence, " 'only where a miscarriage of justice would result if the verdict were to stand.' " *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993) (quoting *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991)). A new trial motion based upon the sufficiency of the evidence deserves especially close scrutiny because such a mo-tion resembles a motion for judgment as a matter of law, inasmuch as it invites the court to substitute its judgment for that of the jury. *Id.* On the other hand, when the movant seeks a new trial based upon trial error, the district court has somewhat greater discretion. Errors in judicial rulings or in the conduct of the court permit the court to order a new trial where the error or conduct was prejudicial. 6A James Wm. Moore, *Moore's Federal Practice* § 59.08(2) (2d ed.1996). However, even if the court determines that an error was made, it should not grant a new trial unless it also determines that the error was so prejudicial that "refusal to take such action appears to the court inconsistent with substantial justice." Fed. R.Civ.P. 61. *See also Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D.Pa.1989), *aff'd*, 922 F.2d 184 (3d Cir. 1990). In order to mandate a new trial, an error in a jury instruction must be so substantial that, viewed in light of the charge as a whole, " 'the instruction was capable of confusing and thereby misleading the jury.' " *Link v. Mercedes-Benz*, 788 F.2d 918, 922 (3d Cir.1986) (quoting *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984)).

## III. Discussion

### A. Liability and Compensatory Damages

Defendants contend that the jury's verdict as to liability must be set aside. I will first address the numerous reasons defendants offer in support of this contention before turning to the award of punitive damages, which defendants also contest in this motion. Obviously, the jury's award of punitive damages, cannot stand in the event its findings as to liability and the accompanying compensatory awards must be reversed.

#### 1. Plaintiffs' Tort Claims

Defendants contend that they are entitled to judgment as a matter of law on plaintiffs' claims for tortious interference with prospective economic relations and tortious interference with contract. Defendants' Brief at 19. The thrust of the defendants' argument in support of this contention is, as it was when defendants first moved for

judgment as a matter of law on this basis, that Orthofix, S.r.l. has supported its claims that EBI tortiously interfered with its prospective business relationships with evidence of mere breaches of the Distributor Agreement. Quite apart from the alleged breaches of the Distributor Agreement, plaintiffs showed that defendants unlawfully acquired bone fixators through Biomet's European distributors and cooperative physicians. *See, e.g.,* PX–281; Tr. at 1100. Moreover, defendants purchased Orthofix bone fixators, often in small quantities, using third-party checks, in an attempt to deceive Orthofix as to the destination of the product. PX–285. Not only was Orthofix intentionally deceived, as by statements that EBIMS's inventory was "dangerously low," tr. at 978, but the products so acquired were thereafter marketed in direct competition with Orthofix, Inc. I conclude that such evidence is sufficient to allow a reasonable jury to decide that the defendants' conduct amounted to tortious interference with Orthofix's prospective economic advantage.

■ Defendants also contend that plaintiffs did not present evidence of damages flowing from the tortious interference, but solely presented evidence of damages from the alleged breach of contract. Because plaintiffs never claimed any distinct or additional compensatory damages arising from the torts, it is of little consequence that there are no separate damage calculations. Plaintiffs' expert testified to the entire amount of plaintiffs' damages. Defendants challenged that testimony upon cross-examination. I concluded, at trial, that requiring plaintiffs to itemize their damages as to each legal claim would be unnecessarily confusing to the jury and would risk a double, or even treble, recovery. The entire amount of damages plaintiffs sought for "lost profits" was presented to the jury and supported by expert testimony. Accordingly, there is sufficient evidence of plaintiffs' damages for tortious interference to support the jury's verdict, as there is for plaintiffs' contract damages.

2. In Pari Delicto *and "Unclean Hands"*

■ Defendants raise the twin doctrines of "unclean hands" and *"in pari delicto"* in support of their motion for judgment as a matter of law. It is an ancient maxim of equity that "he who comes into equity must come with clean hands." The "unclean hands" doctrine "embraces the principle that a court should not grant equitable relief to a party who is a wrongdoer with respect to the subject matter of the suit." *Pellitteri v. Pellitteri,* 266 N.J.Super. 56, 65, 628 A.2d 784 (App.Div.1993) (citation omitted). Implementing the doctrine "calls for the exercise of careful and just discretion in denying remedies where a suitor is guilty of bad faith, fraud or unconscionable acts in the underlying transaction." *Id.* "The 'unclean hands' doctrine 'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *ABF Freight Sys., Inc. v. N.L.R.B.,* 510 U.S. 317, 329–30, 114 S.Ct. 835, 842, 127 L.Ed.2d 152 (1994) (Scalia, J., concurring) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)). The purpose of the doctrine is to protect the integrity of courts of equity. Since defendants' motion seeks relief from the jury's verdict, and not from any award of injunctive relief, the "unclean hands" doctrine is not applicable in the circumstances. *See McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 756 n. 10 (3d Cir.1990).

■ Given the scope of this motion, defendants more appropriately raise the doctrine of *"in pari delicto."* This doctrine "derives from the Latin maxim, *in pari delicto potior est conditio defendentis,* which means: 'In a case of equal or mutual fault ... the position of the party ... [defending] is the better one.'" *McAdam,* 896 F.2d at 756 (quoting Black's Law Dictionary 711 (5th ed.1979)). As the Third Circuit points out, "[u]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Id.* (citing *Pinter v. Dahl,* 486 U.S. 622, 635, 108 S.Ct. 2063, 2072, 100 L.Ed.2d 658 (1988)). New Jersey law is in accord with this interpretation of the doc-

trine. *See, e.g., Stella v. Dean Witter Reynolds, Inc.,* 241 N.J.Super. 55, 73, 574 A.2d 468 (App.Div.1990) (The *in pari delicto* doctrine requires "at least substantially equal responsibility."). It is clear from the jury's verdict that it considered the plaintiffs comparatively innocent of wrongdoing. The jury both condemned the defendants' conduct through an award of punitive damages, and assessed a sizeable award of compensatory damages in favor of the plaintiffs compared with only a nominal award of damages to the defendants. On this record, the doctrine of *in pari delicto* simply does not apply.

### 3. Mutual Breach

◼ Nor does the fact that the jury found both parties in breach of the contract prohibit an award of damages to the plaintiffs. At defendants' request, the court gave the following charge: "Under certain circumstances a material breach by one party may relieve the other party of its duty to continue to perform under the contract." Tr. at 5143–5144. Defendants raised no objection to the wording of the charge. Accordingly, defendants cannot now be heard to complain that any breach by Orthofix, material or otherwise, excused EBIMS's duty to perform under the Distributor Agreement. Fed. R.Civ.P. 51. Moreover, the cases cited by defendants do not stand for the proposition

that *any* breach by one party to a contract excuses performance by the other, nor has this court's independent research uncovered any authority for such a broad proposition.

### 4. Irreconcilable Inconsistency in the Verdict

In further support of their twin contentions that a "mutual breach" precludes either party from recovering damages, and that such a mutual breach occurred in this case, defendants raise what they deem to be an inconsistency in the jury's verdict. Defendants assert that the jury must have found that EBIMS placed "excessive" orders in breach of the contract, yet the jury also found that Orthofix breached the contracts by failing to ship those "excessive" orders. Defendants' Brief at 14.

Plaintiffs contend that the defendants' failure to bring alleged inconsistencies in the verdict sheet to the court's attention, before the jury was discharged, effectively waived defendants' right to seek a new trial on this basis. Plaintiffs' Brief at 9–10. Whether or not the failure to raise this issue constitutes a waiver may depend on whether the special verdict sheet in this case was governed by Rule 49(a)[1] or Rule 49(b)[2] of the Federal Rules of Civil Procedure.

1. Rule 49(a) provides:

Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

2. Rule 49(b) provides:

General Verdict Accompanied by Answer to Interrogatories. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more

The majority of circuits that have interpreted Rule 49(b) require parties to object to alleged inconsistencies in the verdict before the jury is discharged. *See, e.g., Coralluzzo v. Education Mgmt. Corp.,* 86 F.3d 185, 186 (11th Cir.1996) (Challenges to the consistency of special verdicts "must be raised before the jury is excused" or they are waived.); *White v. Celotex,* 878 F.2d 144, 146 (4th Cir.1989) (allowing the original deliberating body to reconcile inconsistencies prevents counsel from making an "end run" around Rule 49); *United States Football League v. National Football League,* 842 F.2d 1335, 1367 (2d Cir.1988); *Strauss v. Stratojac Corp.,* 810 F.2d 679, 682–83 (7th Cir.1987) (invocation of the waiver rule promotes the just and efficient operation of the federal courts); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1423 (10th Cir.1986); *Merchant v. Ruhle,* 740 F.2d 86, 92 (1st Cir.1984) (application of waiver rule prevents trial counsel from using "agreeable acquiescence to perceivable error as a weapon of appellate advocacy"); *Haskell v. Kaman Corp.,* 743 F.2d 113 (2d Cir.1984); *Fernandez v. Chardon,* 681 F.2d 42, 58 (1st Cir.1982) (because counsel waited until after the jury was excused before raising a claim of inconsistency, defendants waived their right to have the general verdict set aside on that ground), *aff'd sub nom. Chardon v. Fumero Soto,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983); *Stancill v. McKenzie Tank Lines, Inc.,* 497 F.2d 529, 534–35 (5th Cir.1974) (same); *see also* 9A Charles A. Wright & Arthur R. Miller, *supra,* § 2513, at 226–27. At least one judge in the Third Circuit has opined that "it probably is necessary, as it is in the majority of the circuits, to raise prior to the jury's dismissal an objection based on the inconsistency of the answers to interrogatories supporting a general verdict rendered under Rule 49(b)." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1056–57 (3d Cir.1991) (Becker, J., announcing the judgment of the court).

■ However, no such requirement applies to verdicts controlled by Rule 49(a). *Malley–Duff & Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133, 145 (3d Cir.1984). If such a verdict is inconsistent, the court may order a new trial regardless of whether the inconsistency was raised before the jury was excused. *Halprin v. Mora,* 231 F.2d 197, 201 (3d Cir.1956) (cited in *Malley–Duff,* 734 F.2d at 145).

As the Third Circuit has observed, "in many cases, it is not entirely clear whether the verdict is governed by Fed.R.Civ.P. 49(a) or 49(b)." *Loughman v. Consol–Pennsylvania Coal Co.,* 6 F.3d 88, 104 n. 16 (3d Cir. 1993). This is one such case, in which the jury was asked to make specific findings as to ultimate issues of fact as well as issues of evidentiary fact.[3] To the end that any confusion regarding the parties' obligations under Rule 49 might be dispelled, this court specifically invited counsel to object to the jury's verdict on the ground of inconsistency, before excusing the jury. Tr. at 5388. Counsel for the defendants lodged no objection at that time.

■ Fortunately, I need not decide whether defendants' waived the alleged inconsistencies in the verdict by failing to object before the jury was discharged. Defendants cannot obtain a new trial on this basis.[4] The standard for granting a new trial based upon inconsistencies in the jury's verdict has been explained by the Supreme Court as follows:

is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

3. According to one authority, however, the special verdict under Rule 49(a) is "typically used to divide the dispute into 'ultimate,' not actual facts." Mark S. Brodin, *Accuracy, Efficiency, and Accountability in the Litigation Process—The Case for the Fact Verdict,* 59 U. Cin. L.Rev. 15, 85 (1990).

4. I note that defendants also seek judgment as a matter of law on this basis. A party cannot make a Rule 50(b) motion based upon inconsistencies in the jury's verdict. *Mosley v. Wilson,* 102 F.3d 85, 90 (3d Cir.1996) (an inconsistent verdict could not have been raised in a motion for directed verdict prior to jury deliberations, therefore, it cannot support a post-trial motion for judgment as a matter of law).

Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). Furthermore, "a verdict must be molded consistently with a jury's answers to special interrogatories when there is *any* view of the case which reconciles the various answers." *Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153, 1159 (3d Cir.) (emphasis added). Indeed, the Supreme Court has instructed that a court "must attempt to reconcile the jury's findings, *by exegesis if necessary,* ..., before [it is] free to disregard the jury's special verdict and [order] a new trial." *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (emphasis added).

■ This is a stringent standard. In this case, contrary to defendants' assertion, there clearly is a view of the case that makes the jury's answers to the special verdict sheet internally consistent, and consistent with the evidence presented at trial.

The jury need not necessarily have found, as defendants argue, that Orthofix breached the Distributor Agreement by refusing to ship the "excessive" orders placed by EBIMS. Rather, the jury could have determined that Orthofix breached the Distributor Agreement by transmitting EBI's inventory worksheets to American Medical Electronics. The jury could also have concluded that Orthofix tortiously interfered with EBI when it diverted the May 1995 shipment in breach of its duty of good faith under the purchase order contracts. Neither of these views is at all inconsistent with a jury finding that EBIMS breached its duty of good faith under the Distributor Agreement by placing "excessive" orders. Defendants are not entitled to a new trial based upon alleged inconsistencies in the jury's verdict, much less are they entitled to judgment in their favor on this basis.

### 5. Federal Food and Drug Administration Regulations

■ Defendants assert that they were prejudiced by the admission of testimony regarding their alleged infractions of certain regulations of the federal Food and Drug Administration. Defendants' Brief at 33–34. Defendants seek a new trial on this basis. Because defendants failed to object on the basis of prejudice to any of the statements they now assert as grounds for a new trial, and because, to the extent there may have been any prejudice, defendants sought and obtained a curative jury instruction, the present assertion of prejudice is without merit.

At trial, defendants objected "to the relevance" of certain testimony concerning alleged violations of Food and Drug Administration regulations. Defendants' Brief at 34. Ultimately, the court refused plaintiffs' request that the court take judicial notice of these regulations, on the ground that no tort duty of care was established by law or FDA regulation. Tr. at 4769–4773. The court then adopted, over the plaintiffs' objection, a curative instruction proposed by the defendants, which prohibited the jury from considering testimony regarding alleged FDA violations. Tr. at 5172. On May 23, 1997, when that jury charge was discussed and adopted by the court, counsel for the defendants expressed his opinion that the instruction "perfectly addresses the concern with FDA," Tr. at 4950. Defendants cannot now be heard to complain that the introduction of certain evidence of federal regulatory standards so severely prejudiced their case that a new trial must be ordered.

As to defendants' contentions that it was error to admit the testimony of plaintiffs' damages expert and certain hearsay testimony relating to confusion in the marketplace, they have been fully addressed in the record and I will not revisit them at this time. Tr. 4420–4421 (citing *Kraft Gen. Foods, Inc. v. BC–USA, Inc.,* 840 F.Supp. 344, 348 (E.D.Pa. 1993)). Suffice it to say that, even if it was error to admit certain hearsay testimony, which I concluded was admissible under the state of mind exception of Fed.R.Evid. 803(3), no infringement upon defendants'

substantial rights resulted from the admission of this testimony. *See* Fed.R.Civ.P. 61.

### 6. Compensatory Damages Calculations

Defendants contend, as they have throughout this case, that Plaintiffs' damages testimony was inadequate, and that, without proper damages calculations in support of the plaintiffs' case, defendants should prevail as a matter of law. This argument was presented by defendants on their Rule 50 motion made at the close of plaintiffs' case, and again on their Rule 50 motion made at the close of all the evidence.

■ In short, defendants contend that the plaintiffs failed to present testimony separating the damages attributable to each entity and each claim. However, in the court's view, no such testimony was required, inasmuch as Creighton Hoffman, plaintiffs' damages expert, testified that, whatever damages amounts could be calculated for Orthofix, Inc. and IMS, those amounts would be no greater than, and subsumed within the $95 million in lost profits which he calculated for Orthofix S.r.l. Tr. at 4580–4581. Because all of the claims upon which plaintiffs prevailed arose from the same set of facts surrounding the defendants' plan to convert the Orthofix external fixator market to the purchase of Dynafix, and because that plan succeeded, plaintiffs' lost profits need not be assigned to a given legal theory. Damages ordinarily flow from conduct, not from legal theories.

Plaintiffs cannot impugn the jury's verdict simply by asserting that the damages testimony was "undifferentiated." To have required separate damages figures for each Orthofix entity, when plaintiffs themselves admitted such calculations would be duplicative, would have invited confusion and a greater potential for an excessive or duplicative compensatory award. Plaintiffs tried this case on numerous alternative theories of liability each of which would support an award of "lost profits." To the extent the plaintiffs prevailed on any theory which was supported by sufficient evidence, they are entitled to the full measure of compensatory damages, and no more.

Defendants also assert that the damages calculations made by Orthofix's expert were speculative and excessive. Defendants' Brief at 24–25. This contention was first addressed by the court on motions *in limine*, and later, at trial, on Rule 50 motions. As defendants point out, Mr. Hoffman made certain assumptions, based upon AME's past performance and Orthofix's present European market share, among other things, in arriving at the $95 million damages amount to which he testified. The basis for these assumptions was provided in expert testimony from Ms. Sabatino. At the *in limine* stage, I determined that plaintiffs' method of estimating damages, while it certainly yielded a large number, was not flawed as a matter of law. The jury could have rejected that testimony in its entirety. It did not.

Furthermore, testimony by defendants' economic expert, James Malackowski, cast doubt on Mr. Hoffman's lost profits calculations and the methodology he used to arrive at the figures to which he testified. It must be presumed that the jury carefully considered both Mr. Hoffman's testimony and Mr. Malackowski's testimony. Weighing the conflicting testimony of experts is a task for the jury. Here, the jury has considered the evidence and arrived at a figure between the two extremes offered by the experts. I am unwilling to "second guess" the result of the jury's deliberations.

### 7. Lost Profits

■ Defendants contend that "lost profits" were not within the contemplation of the parties at the time the Distributor Agreement was formed, and therefore "lost profits" cannot be the proper measure of damages for breach of contract in this case. This court rejected this contention when defendants first moved for judgment as a matter of law. Tr. at 1658. At that time, the court pointed out that, read as a whole, the Distributor Agreement required EBIMS to protect Orthofix's North American market share from invasion by competitors during the term of the contract. In other words, the Distributor Agreement, unless renewed, would return to Orthofix a substantial share of the U.S. market in external fixators. It follows logi-

cally that the economic impact arising from the loss of that market share, *i.e.,* lost profits, was foreseeable as damages for breach of the contract. Defendants' motion for judgment as a matter of law on this basis must be denied.

### 8. Over-ordering

■■■ As on their motion for judgment as a matter of law made at the close of plaintiffs' case, defendants contend that they are entitled to judgment as a matter of law "that EBI was entitled to sell all the products that Orthofix sold to it." Defendants' Brief at 25. I must confess to being somewhat mystified by this request, insofar as it is cast as one for judgment as a matter of law. As I understand defendants' argument, they contend that EBIMS was not contractually prevented from selling Orthofix products after the expiration of the Distributor Agreement. Similarly, the Distributor Agreement set no specific limits on the amount of products EBIMS could order. Thus, defendants argue, there was no breach of contract in merely ordering and selling Orthofix fixators. *Id.* Yet defendants recognize that, in part because the Distributor Agreement required EBIMS to report its inventory to Orthofix, the jury could have concluded that by "stockpiling" Orthofix products, while intentionally misleading Orthofix as to the size of EBIMS's inventory, defendants breached the implied duty of good faith contained in the contract.[5] *Id.*

Nevertheless, defendants argue that "over-ordering" cannot support plaintiffs' claims for tortious interference. Be that as it may, the "over-ordering," while an integral element of the scheme to secure additional Orthofix inventory in bad faith, was not the only evidence offered in support of plaintiffs' claims of tortious interference. Accordingly, the "judgment" which defendants seek would in no sense relieve them from the jury's verdict. Even if I were inclined to accept defendants' arguments, which I am not, I would decline to grant such ineffectual relief.

### 9. Breaches of the Distributor Agreement

Defendants contend that, even assuming EBIMS breached section 6(e) of the Distributor Agreement, which required EBIMS to supply Orthofix with periodic inventory reports, plaintiffs did not demonstrate any damages resulting from this breach. Defendants' Brief at 26. Whether or not plaintiffs' damages expert connected the breach of a single contractual provision with a fixed amount of damages is ultimately irrelevant. The jury heard testimony connecting this alleged breach with the defendants' successful attempt to secure sufficient inventory to squeeze Orthofix out of the U.S. market. Tr. at 2130. This is all that is required.

■■■ Defendants' also invite this court to revisit its ruling that section 6(d) of the Distributor Agreement, which provided that EBIMS would not "in any way handle" competitive external fixator products, also forbade EBIMS from developing such a product during the term of that agreement. Tr. at 135–143. For support, defendants primarily rely on arguments previously raised, all of which this court has already carefully considered and rejected. The only additional argument defendants offer in support of their contention that the court erred in its ruling is that this reading of the "in any way handle" clause "renders the agreement an unreasonable restraint of trade under U.S. antitrust law." Defendants' Brief at 30. This defense was never set forth in the Joint Final Pretrial Order and so has been waived. *See* Fed.R.Civ.P. 16(e) (pretrial orders "shall control the subsequent course of the action"). In any event, defendants do not point to authority which would support the conclusion that the Distributor Agreement constituted an unreasonable covenant not to compete.

---

5. This admission confounds the defendants' assertion, made in the preceding sentence, that Orthofix's sole remedy against over-ordering was a refusal to ship. Defendants' Brief at 25. New Jersey law, which by stipulation of the parties governed the measure of damages in this case, allows for the recovery of lost profits for breach of the duty of good faith and fair dealing when the contract foresees such damages. *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 425, 690 A.2d 575 (1997) ("[L]ost profits are an appropriate remedy when a buyer breaches the implied covenant of good faith and fair dealing.").

### 10. Defendants' Counterclaims

Defendants also move for judgment as a matter of law on their counterclaims under New Jersey's Franchise Practices Act, N.J. Stat. Ann. § 56:10–1 to 10–29, and for defamation and injurious falsehood. Defendants' Brief at 26–29. At the close of all the evidence, defendants moved for judgment as a matter of law on the following issues: (1) plaintiffs' claims based upon tortious interference with prospective economic relations; (2) Orthofix, S.r.l.'s claim for damages for breach of the distributor agreement; (3) plaintiffs' claim for lost profits; (4) plaintiffs' claim that defendants breached the distributor agreement through over-ordering; (5) plaintiffs' claim for punitive damages; (6) Orthofix, S.r.l.'s claim that EBIMS breached sections 6(e) and 6(l) of the distributor agreement; and, (7) plaintiffs' claim for unjust enrichment. Defendants have now renewed their motion for judgment as a matter of law as to most of these issues pursuant to Rule 50(b). By failing to move at trial for judgment as matter of law on their counterclaims, however, defendants have waived their right to seek judgment as a matter of law at this time.

In considering a renewed motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(b), this court may only review those grounds advanced by the moving party in its motions made at the close of plaintiffs' case and at the close of all the evidence. *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 617 (3d Cir.1989) (cited in the Advisory Committee Notes to 1991 Amendments to Rule 50(b); reversing district court's grant of judgment non *obstante veredicto* on grounds not advanced in the party's pre-verdict motions); *see also American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir.1997) (approving rule set forth in *Kutner Buick* ); 9A Wright & Miller, *supra*, § 2537, at 345. Absent a timely pre-verdict motion, "judicial reexamination of the evidence abridges the plaintiff's Seventh Amendment right to a trial by jury." *Armstrong World Indus.*, 980 F.2d at 183.

Because, at trial, defendants failed to seek judgment as a matter of law on their counterclaims, it would be inappropriate for the court to reach these issues in a post-trial motion. However, it bears stating that, insofar as defendants seek a new trial on these grounds, they have utterly failed to show that any of their substantial rights have been adversely affected by any ruling on these issues. Fed.R.Civ.P. 61. Nor have defendants shown that the jury's verdict is against the weight of the evidence. Indeed, the jury's conclusion that the parties shared no "community of interest" within the meaning of that term under New Jersey's Franchise Practices Act is amply supported by evidence in the record. In view of the rapidity with which defendants converted their sales effort exclusively to the promotion of their own Dynafix external bone fixator, the jury could easily have concluded that no franchise-specific goodwill or product knowledge existed.

Similarly, the jury's findings on defendants' counterclaims for defamation and injurious falsehood are supported by evidence in the record. Orthofix asserted its privilege to make the statements of which defendants complained, and the jury could rationally have found that the privilege applied under these circumstances, even if the statements were defamatory.

### B. Punitive Damages

Having decided that defendants are not entitled to relief from the jury's findings on liability, or from its compensatory damages award, for any of the reasons advanced in this motion, I will now turn my attention to defendants' challenge to the punitive damages award. Defendants seek judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on plaintiffs' claim for punitive damages. Defendants present a number of reasons why they contend this court should set aside the jury's punitive damages award in its entirety.

#### 1. Insufficient Evidence

Defendants first contend that they are entitled to judgment as a matter of law on plaintiffs' claim for punitive damages, because "no evidence was presented regarding malice, willfulness or wantonness." Defendants' Brief at 5. New Jersey's Punitive Damages Act requires proof by clear and

convincing evidence of "actual malice" or "wanton and willful disregard" of persons who might be harmed by the defendant's acts or omissions. N.J. Stat. Ann. § 2A:15–5.12.

 Defendants essentially do not dispute that, in an effort to maintain their dominant position in the United States market for external bone fixators, defendants launched a plan to secure a large inventory of Orthofix products. Defendants also cannot dispute that they concealed the magnitude and details of this effort from Orthofix.

Contrary to defendants' contentions, a rational jury could have concluded, as this one did, that at least some of the acts taken by defendants in furtherance of this scheme were tortious, and that these acts were accompanied by a willful disregard of the plaintiffs' rights. For example, the jury heard evidence that James Pastena, EBI's President, told his sales force that EBI, rather than Orthofix, had decided not to renew the Distributor Agreement. PX–162; Tr. at 900–901. Defendants argue, as they did in support of their motion for judgment as a matter of law at the close of all the evidence,[6] that, whatever evidence of defendants' "lies" emerged at trial, there was no evidence that those lies were intended to harm the plaintiffs, and therefore the "lies" could not support a finding of actual malice, or wanton and reckless disregard. Tr. at 4663. As I understand their argument, defendants contend that Pastena lied to his sales force only in order to encourage them to remain at EBI, and to retain the competitive edge their services represented, but not to harm the plaintiffs. Tr. at 4667. On defendants' motion at the close of all the evidence, I concluded that defendants were asking the court "to weigh this evidence and to make determinations which ... must be made by the jury...." Tr. at 4668. It cannot be said as a matter of law that Pastena had only a benign motive for misleading his sales force. Consonant with the evidence presented at trial, the jury could reasonably have determined that Pastena had, at least, mixed motives for misleading the sales force.

Furthermore, Pastena's "lies" to the EBI sales force form only one portion of the evidence of tortious conduct presented in support of punitive damages. The jury considered evidence from which it could have concluded that Pastena intended the sales force to repeat the "lie" to doctors and hospitals served by EBI, after the Distributor Agreement ended, in an effort to isolate Orthofix and capture the U.S. market for external fixators for EBI. PX–284 (instructing sales representatives. to explain that EBI chose not to renew its exclusive distributorship because it felt that Orthofix "did not address the needs of U.S. surgeons" and "were woefully slow to respond").

Moreover, the jury heard, and apparently credited, testimony that Pastena claimed he would "destroy Orthofix." Tr. at 680. Whether or not Pastena ever denied saying such a thing, tr. at 4664, is immaterial to a Rule 50 motion. Credibility determinations are strictly for the jury. The jury also heard evidence that, on several occasions, EBIMS intentionally deceived Orthofix regarding its level of inventory in order to secure "sufficient" Orthofix products. PX–116; Tr. at 978.

Defendants separately contend that, even assuming, *arguendo*, there was evidence presented at trial of tortious acts amounting to "actual malice," Biomet cannot be liable for punitive damages because none of the acts "was committed by or at the direction of Biomet employees." Defendants' Brief at 5. While Pastena and EBIMS provided perhaps the most vivid evidence of an intent to harm plaintiffs, the jury also considered evidence from which it could have concluded that, acting in concert with the other defendants, Biomet induced one of its European distributors, Ortomed, to purchase Orthofix products on behalf of Biomet and conceal from Orthofix the actual purchaser and destination of the products. Defendants argue that the active concealment, in this instance, was committed by a non-party, Ortomed. However, drawing every reasonable inference in favor of the verdict winner, as I must, *see Bohus v. Beloff*, 950 F.2d 919, 923 (3d Cir.1991) (internal citations omitted). this evidence supports

---

6. This motion was argued on May 22, 1997. Tr. at 4663–4668.

a finding that Biomet instigated the concealment as part of a deliberate plan to deceive Orthofix regarding EBIMS's inventory.

## 2. Breach of Contract

Defendants also argue that the punitive damages award should be set aside because the jury impermissibly awarded punitive damages for breach of contract. Defendants' Brief at 7. The jury was instructed that punitive damages could not be awarded for breach of contract under New Jersey law. The jury was first instructed as follows regarding compensatory and punitive damages: "I will instruct you as to which kinds of damages you may consider for each claim." Tr. at 5191. The jury was then instructed that "[p]unitive damages are not available under the Lanham Act, New Jersey's Franchise Practices Act, or for breach of contract alone. For those claims, you should only consider compensatory damages." Tr. at 5197. Subsequently, the jury was reminded that:

> If you award Orthofix compensatory damages on one or more of its claims for tortious interference with prospective economic advantage, tortious interference with existing contractual relationships, defamation, or common law unfair competition, then you may award punitive damages to Orthofix. Similarly, if you award EBI compensatory damages on one or more of their counterclaims for tortious interference with purchase order contracts, tortious interference with existing contractual relationships, or defamation, you may award punitive damages to EBI.

Tr. at 5203. Finally, the structure of the special interrogatories propounded to the jury did not invite an answer to any question regarding punitive damages, unless liability for some tortious act was first established and compensatory damages awarded for that act. Special Verdict Sheet at 5.

In reviewing a jury verdict, it is proper to "assume that the jury understood and followed the court's instructions." *Loughman,* 6 F.3d at 105. Defendants' argument that the jury assessed punitive damages for breach of contract is without merit,

inasmuch it requires this court to assume that the jury disobeyed its instructions.

## 3. Constitutionality of the Punitive Damages Award

Defendants assail the jury's punitive damages award as unconstitutional. Only when an award of punitive damages is "grossly excessive," and therefore arbitrary, does it violate the Fourteenth Amendment. *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 453, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). This court's inquiry into whether the punitive damages award in this case is "grossly excessive" must begin with an analysis of the goals such an award is intended to promote. *BMW of N. Am., Inc. v. Gore,* — U.S. ——, ——, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). · In *Gore,* BMW had adopted a nationwide policy, apparently within the relevant statutory guidelines adopted in most states, regarding disclosure to new car purchasers of minor presale repairs. *Id.,* — U.S. at ——, 116 S.Ct. at 1593. At trial, the jury determined that BMW's failure to disclose a pre-sale repair to the plaintiff's automobile constituted common-law fraud, awarding $4000.00 in compensatory damages and $4 million in punitive damages.[7] Before the Supreme Court, Dr. Gore argued that the large amount of punitive damages was necessary to alter the defendant's nationwide policy. *Id.,* — U.S. at ——, 116 S.Ct. at 1597. The Court concluded that such a rationale for punitive damages encroached upon permissible legislative and judicial policy choices in other states. *Id.* There has been no similar attempt in this case to justify this award on any "extraterritorial" rationale.

In New Jersey, the purpose of an award of punitive damages is "to punish the defendant and to deter that defendant from repeating such conduct." N.J. Stat. Ann. § 2A:15–5.14; *see also* New Jersey Assembly, Insurance Comm. Statement, Senate No. 1496–L.1995, ch. 142, *reprinted in* N.J. Stat. Ann. § 2A:15–5.9, at 47 (West Supp.1997). Therefore, the degree of reprehensibility of the defendant's conduct is critical to the analysis

---

7. On direct appeal, the Alabama Supreme Court remitted the $4 million figure to $2 million.

of whether punitive damages will serve their intended purpose in any given case. In *Gore,* the Supreme Court was particularly concerned that the trial had produced no evidence of the defendant's bad faith, or that the defendant persisted in any unlawful course of action. *Gore,* —— U.S. at ——, 116 S.Ct. at 1601. While such evidence may not be abundant in this case, it is not, as in *Gore,* totally absent. While defendants are correct in stating that the record reflects "no loss of life, serious health hazard, or major environmental harm" resulting from their conduct, the jury heard evidence that, on at least one occasion, an anaesthetized patient was "inconvenienced," when defendants' substituted a different ankle clamp for the Orthofix model which was routinely purchased by the hospital. Tr. at 1537–1538; 1559–1560.

 While the Supreme Court has consistently refused to draw any mathematical line for excessiveness, the ratio of the punitive award to the compensatory award is normally considered an important factor. *See Gore,* —— U.S. at ——, 116 S.Ct. at 1603 ("When the ratio is ... breathtaking ... the award must surely 'raise a suspicious judicial eyebrow.'") (citing *TXO Prod.,* 509 U.S. at 482, 113 S.Ct. at 2733–32 (O'Connor, J., dissenting)). As *Gore* came to the Supreme Court, the punitive award was 500 times the amount of compensatory damages. In this case, the ratio is closer to two to one. Moreover, where the potential harm from the tortious conduct far exceeds the actual harm, it may be appropriate in certain cases to consider the ratio of the punitive award to the threatened harm when reviewing the constitutionality of a punitive damages award. *See TXO Production,* 509 U.S. at 462, 113 S.Ct. at 2722–23.[8] In sum, there is nothing about the ratio of the punitive damages to

the compensatory damages in this case that "jar[s] one's constitutional sensibilities." *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991). Accordingly, I conclude that the jury's award of punitive damages in this case does not run afoul of the Constitution.

### 4. Defendants' Individual Liability for Punitive Damages

Defendants draw the court's attention to N.J. Stat. Ann. § 2A:15–5.13(e), which requires that: "In any action in which there are two or more defendants, an award of punitive damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." In other words, New Jersey's Punitive Damages Act has abolished joint and several liability for punitive damages.

 Defendants challenge the punitive damages award in this case on the ground that it is not properly apportioned among EBI, EBIMS and Biomet, but instead, presumably runs against all three entities.[9] Because defendants raised no objection to the question on the verdict sheet which requested a single punitive damages award against all defendants, I conclude that they have waived any objection to the amount of the award on this basis. *See* Special Verdict Sheet at 6, question 23.

During the course of the trial, defendants' filed several versions of their Proposed Requests to Charge, each of which contained the following instruction on punitive damages, or one very similar to it: "The punitive damage award must be specific as to any defendant you find liable. The evidence pertaining to one defendant may be irrelevant to

---

8. Although potential, rather than actual economic loss may be a factor in determining whether the punitive damages award passes constitutional muster, New Jersey's Punitive Damages Act requires the jury, in setting the amount of an award of punitive damages, to consider the "profitability of the misconduct to the defendant." The Act does not invite juries to speculate about the "potential profitability" of that misconduct, notwithstanding plaintiffs' attractive arguments to the contrary. *See* Plaintiffs' Brief at 36.

9. Defendants argue that the entire punitive damages award must be "set aside" under this rule "as a matter of law." Defendants' Brief at 10. This objection, if well taken, would only entitle defendants to a new trial on the issue of punitive damages, because the error goes to the instructions to the jury. Accordingly, I will evaluate this contention under the standard for motions for a new trial, rather than as a motion for judgment as a matter of law.

other EBI [sic]. Each defendant is liable only for the amount of the award against that defendant." EBI/Biomet Request No. 79, dated May 23, 1997.[10] Except for the second sentence, the language fairly tracks New Jersey's Punitive Damages Act as set forth above. N.J. Stat. Ann. § 2A:15–5.13(e). With the added sentence removed, and the word "defendant" changed to "offending party," to reflect that both parties had claims for punitive damages, the charge read: "The punitive damage award must be specific as to any offending party you find liable. Each offending party is liable only for the amount of the award against that party." This is the charge that was given. Tr. at 5205.

Notwithstanding the specificity required by the charge, the verdict sheet, as it was submitted to the jury, contained only one question regarding the amount of punitive damages and a single line to be completed by the foreperson.[11] Notably, defendants' proposed verdict sheet, in each of its several manifestations, contained essentially the same single question regarding the amount of punitive damages and a single line for the jury to complete.[12] Not surprisingly, plaintiffs' proposed verdict sheet, which ran to a mere six pages, also contained only a single question regarding the amount of punitive damages and a single blank line.[13] Thus, the structural flaw in the verdict sheet, which permitted the jury to enter an award of punitive damages without specifying against which defendant it should run, was not mere-

ly acquiesced to by the defendants, it was, at least in part, their own creation.

Rule 51 of the Federal Rules of Civil Procedure provides that "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R.Civ.P. 51. Failure to object to interrogatories can be equally fatal. *See Dubrow v. Taglianetti,* Civ. Action No. 94–4995, 1996 WL 750056, at *7 (E.D.Pa. Dec.30, 1996) (defendant failed to object to interrogatories on the basis of lack of itemization of damages, and so waived objection); *see also McCarthy v. Silver Bulk Shipping Ltd.,* 487 F.Supp. 1021, 1032 (E.D.Pa.1980) ("Defendant did not note his objections on this issue either during the framing and presenting of the interrogatories to the jury or in response to the charge, and has therefore waived his objection.").

Notwithstanding a party's failure to object under Rule 51, this court may still grant a new trial on this basis if "the error is fundamental and highly prejudicial." *Wagner v. Firestone Tire & Rubber Co.,* 890 F.2d 652, 658 (3d Cir.1989) (internal citations omitted). In order to merit review under this judicially created exception to the waiver rule, the error must be such that the failure to consider it would result in a "miscarriage of justice." *Beardshall v. Minuteman Press Int'l Inc.,* 664 F.2d 23, 27 (3d Cir.1981) (quoting *United States v. 564.54 Acres of Land,*

---

**10.** I have quoted from the defendants' final submission, dated May 23, 1997, in which the parties set forth a "joint" request, and each set forth separately those requests about which they disagreed. As noted, this quote is taken from defendants' submission, denoting that it was not agreed upon by plaintiffs.

**11.** If the jury was satisfied that an award of punitive damages in favor of Orthofix was appropriate, they were asked:

What amount of punitive damages, if any, do you award to Orthofix?
$_____
Special Verdict Sheet, Question 23. *See* Tr. at 5382.

**12.** For example, defendants' final Revised Verdict Sheet, dated May 27, 1997, which runs to sixty-two pages, asks:

**Finding (check only one)**
_____ We, the jury, find for EBI on Orthofix's claim for punitive damages.
_____ We, the jury, find for Orthofix on Orthofix's claim for punitive damages.
If you entered a finding in favor of Orthofix on its claim for punitive damages, please set forth below your determination of the amount of those punitive damages:
Punitive damages $_____

**13.** Plaintiffs' requested verdict sheet, in pertinent part, asked the following:

[I]f you determine that EBI/Biomet are liable for punitive damages, state the amount of punitive damages that you award:
$_____

576 F.2d 983, 987 (3d Cir.1978), *rev'd on other grounds,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)). Unless courts exercise their discretion sparingly to review errors in jury instructions which were not objected to at trial, they risk weakening the important policies served by Rule 51. *See McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 769 n. 29 (3d Cir.1990). On this record, it cannot be said that the jury's failure to allocate its punitive damages award among the defendants resulted in manifest injustice.

This is not a situation in which the error clearly allowed the jury to mistake the burden of proof. *See Ratay v. Lincoln Nat'l Life Ins. Co.,* 378 F.2d 209 (3d Cir.1967) (holding that the trial court's charge that fraud must be proved only by a preponderance of the evidence was fundamental error). Nor is this a case in which the jury may have awarded greater damages than were legally compensable. *See Bereda v. Pickering Creek Indus. Park, Inc.,* 865 F.2d 49, 53 (3d Cir. 1989). On the contrary, the jury in this case necessarily evaluated the tortious conduct of all three defendants before arriving at a conclusion regarding punitive damages. Moreover, the jury was properly instructed on the relevant law. The fact that the Special Verdict Sheet invited a "lump sum" award, rather than reflecting a separate amount of punitive damages against each defendant, was a product of the parties' oversight in drafting the verdict sheet, but was not the kind of error that left the jury "without adequate guidance on a fundamental question." *564.54 Acres of Land,* 576 F.2d at 987. Indeed, the jury's failure to question the apparent discrepancy between the instruction on punitive damages and the form of the verdict sheet can, at least in part, be attributed to the defendants' own trial strategy. Defendants never argued to the jury that one corporate entity, *e.g.* Biomet, was less culpable than another. Therefore, it cannot now be said

that the form of the verdict sheet so affected Biomet's substantial rights that a new trial is merited on that basis. That said, the amount of the jury's award of punitive damages remains troubling, in light of the entire record.

### 5. Review Under New Jersey's Punitive Damages Act

New Jersey's Punitive Damages Act requires this court to review the jury's award of punitive damages in this case. This review, conducted under the legal standard mandated in the Act, forms a part of the substantive law of New Jersey, whose law provided the rule of decision on plaintiffs' tort damages.[14] Therefore, the Act must be applied in considering a motion for a new trial or remittitur, as long as this court "can give effect to the substantive thrust of [the Act] without untoward alteration of the federal scheme for the trial and decision of civil cases." *Gasperini v. Center for Humanities, Inc.,* 518 U.S. ——, ——, 116 S.Ct. 2211, 2219, 135 L.Ed.2d 659 (1996).

The Punitive Damages Act requires that:

> Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.

N.J. Stat. Ann. § 2A:15–5.14(a).[15] In *Gasperini,* the Supreme Court considered a New York statute which established that the amount of a jury verdict would be "excessive or inadequate" if the award "deviates materially from what would be reasonable compensation." *Gasperini,* —— U.S. at —— & n. 4, 116 S.Ct. at 2217 & n. 4. The Court observed that the New York legislature thereby re-

---

14. In most cases, the review mandated by New Jersey's Punitive Damages Act would undoubtedly "have so important an effect upon the fortunes of one or both of the litigants · that failure to enforce it would be likely to cause a plaintiff to choose the federal court." *Hanna v. Plumer,* 380 U.S. 460, 468 n. 9, 85 S.Ct. 1136, 1142 n. 9, 14 L.Ed.2d 8 (1965).

15. Whether the review is undertaken before judgment is entered, or, as here, on a timely Rule 59 motion, is a matter of procedure, not substantive state law. *See Gasperini,* —— U.S. at ——–——, 116 S.Ct. at 2221–25 (New York statute's substantive direction to the state's Appellate Division could be applied by the federal district court, in the first instance, on a Rule 59 motion).

quired greater judicial scrutiny of jury awards than had existed under the common law "shocks the conscience" test. *Id.,* —— U.S. at ——–——, 116 S.Ct. at 2217–18. Similarly, when the New Jersey legislature enacted punitive damages reform, it specified that such awards must be "reasonable" and "justified in the circumstances." This standard, like the New York standard discussed in *Gasperini,* is a clear departure from the common law "shocks the conscience" test. *See, e.g., Taweel v. Starn's Shoprite Supermarket,* 58 N.J. 227, 236, 276 A.2d 861 (1971) (jury's assessment of damages should not be overturned unless so disproportionate as to shock the conscience of the court).[16]

Because the Punitive Damages Act took effect relatively recently, October 27, 1995, there are no reported New Jersey cases defining the proper scope of the "reasonable and justified" standard of review.[17] Moreover, there are no comparable cases in which similar amounts of punitive damages have been either upheld or reduced under § 2A:15–5.14(a). *See Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 206 (3d Cir.1996) (In deciding the propriety of an order of remittitur, "a review of jury verdicts in other cases may prove helpful, though not mandatory."); *Dunn v. HOVIC,* 1 F.3d 1371, 1391 (3d Cir. 1993) (After the district court had ordered remittitur of the punitive damages award from $25 million to $2 million, the Third Circuit, upon reviewing jury verdicts in similar cases, ordered a further remittitur of the punitive damages to $1 million, "the maxi-

mum amount that could reasonably have been awarded in this case."), *modified on other grounds,* 13 F.3d 58 (3d Cir.1993).[18] Although there are similar laws in other states, *see, e.g.,* Miss. Stat. § 11–1–65(f)(i) (effective July 1, 1993),[19] a survey of the case law in other jurisdictions reveals no cases interpreting a "reasonableness" standard similar to the one set forth in the New Jersey statute.

In assessing whether the amount of an award of punitive damages is reasonable, I begin with the same factors the jury considered in setting the amount of that award: (1) the likelihood of serious harm resulting from defendants' misconduct; (2) the defendants' awareness or reckless disregard of that likelihood; (3) the conduct of the defendants upon learning that their initial misconduct would likely cause harm; (4) the duration of the misconduct or any concealment of the misconduct by the defendant; (5) the profitability of the misconduct; (6) when the misconduct was terminated; and (7) the defendant's financial condition. *See* Tr. at 5205; N.J. Stat. Ann. § 2A:15–5.12. It is also appropriate to consider the nature and extent of the harm done. *See* Restatement (Second) of Torts § 908, cmt. e.

■■■■ In this case, defendants devised and undertook a plan to deprive Orthofix of the good will and product recognition which existed for Orthofix bone fixators. This plan was largely successful, and defendants were able to secure a large part of the external bone fixator market for the Dynafix product

---

16. For the same reason, I am convinced that an award may be so large that it will not survive the review mandated under New Jersey's Punitive Damages Act, although the award is not unconstitutional.

17. This case was filed on November 29, 1995.

18. While it is appealing to compare awards in similar cases, I bear in mind that the jury system naturally produces inconsistent awards. As Justice Anthony Kennedy has pointed out, some inconsistency in jury results can be expected for at least two reasons:

> First, the jury is empaneled to act as a decisionmaker in a single case, not as a more permanent body. As a necessary consequence of this case-to-case existence, juries may tend to reach disparate outcomes based on the same

instructions. Second, the generality of the instructions may contribute to a certain lack of predictability. The law encompasses standards phrased at varying levels of generality. As with other adjudicators, the jury may be instructed to follow a rule of certain and specific content ... or ... the standard can be more abstract and general to give the adjudicator flexibility in resolving the dispute at hand.

*Haslip,* 499 U.S. at 40, 111 S.Ct. at 1055 (Kennedy, J., concurring).

19. This subsection provides: "Before entering judgment for an award of punitive damages the trial court shall ascertain that the award is reasonable in its amount and rationally related to the purpose to punish what occurred giving rise to the award and to deter its repetition by the defendant and others." Miss.Code Ann. § 11–1–65(1)(f)(i).

which they produce. The jury concluded that this plan involved acts of deception and, at least, reckless disregard of the consequences to Orthofix. Nor is there evidence in the record that defendants ceased their misconduct upon learning of the harm to Orthofix, or attempted to correct its harmful effects. Indeed, there is evidence of concealment of the misconduct. All of these factors support an award of punitive damages.

In setting the amount of this award of punitive damages, the jury was instructed to consider the profitability of the defendants' misconduct, its duration and the wealth of the defendants. Plaintiffs presented evidence that, by securing for themselves the market in bone fixators which had previously been Orthofix's, the defendants profited by "approximately 97 million dollars." Tr. at 1280. Moreover, there was no evidence that defendants terminated the plan to deprive Orthofix of this market before that plan achieved its purpose. These factors too might justify a substantial award of punitive damages.

I am convinced, however, that the jury departed from a reasonable award in considering the wealth of the defendants. There was no testimony or evidence presented as to the net worth of EBI or EBIMS. The evidence of Biomet's fiscal 1996 cash-on-hand, $106,000,000.00, corresponds closely with the amount of punitive damages awarded by the jury in this case, $100,600,000.00. There was evidence presented at trial that EBI and EBIMS represented only a portion of the total assets of Biomet. I therefore conclude that, although properly considering the conduct of all three defendants in setting the amount of punitive damages, the jury gave too much weight to the net worth of only one defendant, by far the largest, Biomet. In so doing, the jury arrived at an amount that is not reasonable given the relative size of EBI and EBIMS.

Furthermore, the nature of the harm and its potential for repetition are important factors in determining the amount of an award of punitive damages. As part of this court's duty to review the award of punitive damages in this case, "in light of the purpose to punish the defendant[s] and deter th[ose]

defendant[s] from repeating such conduct," it is also appropriate to weigh the likelihood of repetition of the conduct at issue in this case.

In *Brink's Inc. v. City of New York,* the district court remitted a jury award of punitive damages in the amount of $ 5,000,000 to $1,500,000, because the threat of similar injury to others was minimal, and because there was little likelihood of a recurrence, and the injury, even assuming repetition, was loss of money "not death or severe personal injury." *Brink's v. City of New York,* 546 F.Supp. 403, 413–14 (1982). Here too, there seems to be little chance of a recurrence of the conduct at issue in this case. Defendants took advantage of an exclusive relationship with Orthofix in order to harm Orthofix and capture the external bone fixator market in the United States for themselves. No evidence emerged at trial which could have convinced the jury that this circumstance, or a substantially similar one, was likely to arise again in the future. On the contrary, the evidence points to a unique relationship between plaintiffs and defendants, which went uniquely wrong. This fact undercuts the need for a deterrent on the order of $ 100,600,000.00.

Moreover, much as plaintiffs argue that defendants' conduct created a serious threat to public health, the evidence of such a threat did not emerge at trial. Certainly, there was testimony concerning the incident in which an anaesthetized patient was kept waiting for an ankle clamp. However, the surgeon, in that instance, apparently used the substituted ankle clamp without difficulty. Tr. at 1559. There was also testimony, from Mr. Edgar Wallner, President and CEO of the Orthofix Group, to his understanding that there had been "a problem" using a non-orthofix ankle clamp with Orthofix components. Tr. at 643. Furthermore, although Mr. Wallner testified that the non-orthofix ankle clamp differed "biomechanically" from the Orthofix clamp, tr. at 645, plaintiffs can point to no evidence that it was unsafe. Plaintiffs' Brief at 31–32. In support of their argument that the jury's punitive damage award is reasonably related to the harm caused by defendants' conduct, plaintiffs contend that the greater the magnitude of the hazard to the public, the greater the need to

deter such conduct. *Id.* at 33 (citing David G. Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1258, 1316 (1976)). This maxim may be especially applicable to a products liability case. However, it would be a mistake to equate the purely economic harm to Orthofix in this case with the harm to an unsuspecting public which arises from a faulty product. It simply was never shown that the external bone fixators developed by Biomet represented a hazard to the public. Similarly, although plaintiffs introduced a warning letter that EBIMS received from the FDA, the testimony never established the seriousness of the reported violations, or the potential harm to patients, if any, arising from those violations.

At bottom, this case, like *Brink's,* is about the collapse of a contractual relationship. As the *Brink's* court pointed out, contracts usually concern private rights, not public rights. *Brink's,* 546 F.Supp. at 413. In light of their limited purpose, punitive damages ought to play a much more circumscribed role in enforcing private rights.

Plaintiffs contend that the $100,600,000.00 award of punitive damages is "reasonable," because it is well within the statutory cap on punitive damages, five times the compensatory damages. *See* N.J. Stat. Ann. § 2A:15–5.14(b). While the ratio of the punitive damages award in this case to the compensatory damages is only 2.1:1, the ratio alone is of little assistance. As plaintiffs must realize "it is elementary that [the court] must construe a statute so as to give effect to every word." *Scheidemann v. I.N.S.,* 83 F.3d 1517, 1524 (3d Cir.1996); *see also United States v. Alaska,* —— U.S. ——, ——, 117 S.Ct. 1888, 1918, 138 L.Ed.2d 231 (1997) ("The Court will avoid an interpretation of a statute that 'renders some words altogether redundant.' ") (quoting *Gustafson v. Alloyd Company, Inc.,* 513 U.S. 561, 574, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995)). If everything beneath the cap is automatically "reasonable," and no defendant is liable for any amount in excess of the cap, then the legislature need not have mandated judicial review of punitive damages awards for "reasonableness." In short, by plaintiffs' reasoning, subsection 5.14(b) of New Jersey's Punitive Damages Act would

make a nullity out of a specific requirement of subsection 5.14(a). *See United States v. LaBonte,* —— U.S. ——, ——, 117 S.Ct. 1673, 1678, 137 L.Ed.2d 1001 (1997) (refusing to read one section of a statute as "essentially rendering meaningless entire provisions of other statutes").

Moreover, while the ratio of punitive damages to compensatory damages in this case is relatively small, 2.1:1, the resulting amount of punitive damages is large, $100,600,000.00. The New Jersey cases plaintiffs cite in which even greater ratios have been upheld, all involved much smaller actual awards. In *Leimgruber v. Claridge Assoc., Ltd.,* 73 N.J. 450, 375 A.2d 652 (1977), a ratio of 9.7:1 was upheld, but the compensatory damages were only $1,700, and the punitive damages only $16,500. *See also Velop, Inc. v. Kaplan,* 301 N.J.Super. 32, 70, 693 A.2d 917 (App.Div. 1997) (upholding punitive damages awards of $300,000 against each of two defendants whose share of the compensatory award was $35,670.60 each); *Almog v. Israel Travel Advisory Serv., Inc.,* 298 N.J.Super. 145, 161–62, 689 A.2d 158 (App.Div.1997) (upholding punitive damages award of $4,500,000 against compensatory damages of $1,324,000); *see also Levinson v. Prentice–Hall, Inc.,* 868 F.2d 558, 565 (3d Cir.1989).

The Supreme Court of New Jersey has recognized that "[t]he reasonableness of the relationship of punitive damages to actual injury must be considered in light of other factors in each case." *Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 673, 512 A.2d 466 (1986). As that court noted, "particularly egregious conduct may generate only minimal compensatory damages." *Id.* When that happens, "higher punitive damages would be justified than when substantial compensatory damages are awarded." *Id.* Therefore, one naturally expects a much lower ratio when a substantial award of compensatory damages has been made. *Cf. Gore,* —— U.S. at ——, 116 S.Ct. at 1602 ("low awards of compensatory damages may properly support a higher ratio than high compensatory awards").

In light of the entire record, and in view of the factors which must be considered under New Jersey law in setting the amount of a punitive damages award, I conclude that the

maximum amount of punitive damages a jury could award, which would be reasonable and justified in these circumstances, would be fifty million dollars, and I will order a remittitur to that amount.[20]

 A district court that finds the amount of an award of damages to be excessive cannot merely order a reduction in the award. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 2815. The court can, however, order a new trial limited to the issue of damages, or condition the denial of a new trial on plaintiff's acceptance of the reduced damage award. *Id.; see also Spence v. Board of Educ.,* 806 F.2d 1198, 1201 (3d Cir.1986). Remittitur, therefore, offers the plaintiff a choice between a reduced award of damages and a new trial. Accordingly, plaintiffs will be afforded twenty (20) days from the date of this opinion and order to inform the defendants, in writing of their decision, and to file with the court an Amended Judgment indicating their acceptance of the remittitur, or a new trial, limited to the issue of punitive damages, will be scheduled.

## IV. Conclusion

For the foregoing reasons, defendants' renewed motion for judgment as a matter of law will be denied. Because the jury's award of punitive damages in this case is not reasonable and justified in the circumstances, I will order the plaintiffs to file a remittitur of the amount of the punitive damages award in excess of $50 million, if they wish to avoid a new trial on the issue of punitive damages.

Defendants' Rule 62(b) Motion for a Stay Without Bond during the pendency of these post-trial motions, which is returnable September 5, 1997, will be dismissed as moot. This court will enter appropriate order.

## ORDER

This matter having come before the Court on Defendants' Motion for Judgment as a Matter of Law pursuant to Fed.R.Civ.P. 50(b), and upon Defendants' Alternative Motion for a New Trial or Remittitur pursuant to Fed.R.Civ.P. 59, and upon Defendants' Motion for a Stay Without Bond pursuant to Fed.R.Civ.P. 62(b), Dennis P. Orr, Esq., of Mayer, Brown & Platt, and Stephen J. Marzen, Esq., of Shearman & Sterling, and Joel Schneider, Esq., of Archer & Greiner, appearing on behalf of the plaintiffs/counter-claim-defendants, Orthofix, S.r.l., Orthofix, Inc., and Inter Medical Supplies, Limited, and James J. Ferrelli, Esq., of Duane, Morris & Heckscher, and Arthur P. Kallares, Esq., and Thomas E. Mixdorf, Esq., of Ice, Miller, Donadio & Ryan, appearing on behalf of the defendants/counterclaimants, EBI Medical Systems, Inc., Electro–Biology, Inc., and Biomet, Inc.; and,

The Court having considered the motion and the briefs and exhibits filed in support of and in opposition to this motion, for the reasons set forth in this Court's OPINION filed concurrently with this ORDER;

It is, on this 28th day of August, 1997, ORDERED that Defendants' Motion for Judgment as a Matter of Law pursuant to Fed.R.Civ.P. 50(b) is DENIED; and,

It is further ORDERED that Defendants' Motion for a New Trial as to punitive damages is conditionally granted, unless Plaintiffs shall, within twenty (20) days of the date of this ORDER, file with this Court an Amended Judgment reflecting their acceptance of a remittitur of the amount of the jury's award of punitive damages in excess of fifty million dollars ($50,000,000.00); and,

It is further ORDERED that Defendants' Motion for a Stay Without Bond pursuant to

---

**20.** This disposition fully addresses the defendants' contention, made elsewhere in its brief, that the amount of punitive damages is against the weight of the evidence, warranting a new trial or remittitur. However, I add that I find no merit in defendants' contention that plaintiffs never "split out" the damages arising from their separate claims and never identified which conduct gave rise to which claims. The jury could properly consider "the profitability of the mis-

conduct," without such a demonstration. Plaintiffs put on evidence of the profitability to the defendants of the U.S. market in external fixators, that is, the profitability of defendants' entire "scheme" to supplant Orthofix as a leading provider of external bone fixators. New Jersey's Punitive Damages Act requires no more. It must be assumed that the jury properly weighed this factor.

Fed.R.Civ.P. 62(b) is DISMISSED AS MOOT.